HART, RESPONDENT, *v.* BARRON ET AL., APPELLANTS.

No. 8842

Submitted January 14, 1949.   Decided March 23, 1949.

204 Pac. (2d) 797

352

Mr. E. E. Collins and Mr. Melvin N. Hoiness, both of Billings, for appellants.  Mr. Collins argued the cause orally.

Mr. E. A. Blenkner and Mr. M. L. Parcells, both of Columbus, for respondent.  Mr. Blenkner argued the cause orally.

MR. CHIEF JUSTICE ADAIR:

Action to quiet title.  From decree for plaintiff the defendants have appealed.

By contract in writing dated August 28, 1942, entered into between Esther Garrigus Winters of Vallejo, California, and the plaintiff, Edmond F. Hart of Absarokee, Montana, the former agreed to sell and convey and the latter agreed to purchase for the sum of $5,800, 153.12 acres of described land in Stillwater county, Montana, including the landlord's share of 1942 crops thereon.

Plaintiff, Hart, contracted: (1) To pay $100 "at or before the execution of this contract;" (2) to pay $5,700 "on approval of title and completion of loan applied for by" plaintiff on lands including those covered by the contract; and (3) "to pay the 1942 taxes" on the land.

Mrs. Winters contracted: (1) To execute a good and sufficient deed of even date with said contract accompanied by abstract showing merchantable title conveying the described land free of all encumbrances; and (2) to deliver said deed with a copy of the contract to the Yellowstone Bank of Columbus, Montana.

In the contract the parties also mutually agreed: (1) That payment of the contract is to be made at said Yellowstone Bank; (2) that said bank "is to hold said deed in escrow and deliver the same to" plaintiff "upon his full compliance of the terms of this contract;" and (3) that plaintiff is to "have possession of premises on expiration of present lease March 1, 1943."

The contract and a proposed form of deed from the owner to plaintiff were drafted by M. L. Parcells, an attorney at law, employed by plaintiff to represent him in his negotiations for the purchase of the land.

On August 28, 1942, plaintiff signed the contract in M. L.

Parcells' office in Columbus, Montana, whereupon said attorney forwarded such contract, together with the proposed deed to Mrs. Winters at Vallejo, California, for her signature and acknowledgment.

Mrs. Winters received the instruments and on September 2, 1942, signed, acknowledged and forwarded same by mail to the Yellowstone Bank of Columbus with a letter addressed to the bank wherein she directed: "I want these held in escrow until final payment is made to me."

Shortly thereafter the plaintiff called on Mrs. Winters' tenants, who were occupying and farming the land on shares under a lease from Mrs. Winters, at which time plaintiff informed the tenants that he had bought the land and would expect the landlord's share of the 1942 crops.

On October 8, 1942, plaintiff again called on the tenants and requested that they assist him in measuring the hay which had been cut and stacked on the land. The tenants declined to comply with plaintiff's request and told him that "there was nothing doing;" that he did not have any hay and that he "did not have any business there."

At the time plaintiff demanded of the tenants the landlord's share of the 1942 crops not a dollar of the agreed consideration had been received by the owner, Mrs. Winters. Plaintiff had not delivered to her the $100 down payment called for by the contract,—he had not delivered to her any part of the purchase price,—he had not completed his proposed loan; he had not paid the 1942 taxes; he had not paid for the land nor acquired title thereto,—in fact, he had not complied with any of the terms of his contract.

The 1942 taxes amounted to but $111.51, while Mrs. Winter's share of the 1942 crops consisted of about 50 tons of hay worth $500, plus 149 bushels of wheat and 200 bushels of barley and oats. Thus did the landlord's share of the crops greatly exceed in amount the taxes due on the land.

On October 8, 1942, the tenants wrote Mrs. Winters a letter advising that the 1942 crops "were better than ever" and ren-

354

dering her a statement of her share thereof. The letter also informed Mrs. Winters that plaintiff had that day made them a visit, telling them that he was on a deal for the land and that he was to have the landlord's share of the crops for the 1942 taxes and that he had ordered the tenants not to sell any part of the landlord's share of the crops as he now had Mrs. Winters "tied up" on a contract so that she "couldn't do anything for the next 10 years or more if he wanted to hold" her to it.

The letter to Mrs. Winters further stated: "I don't see where he [plaintiff] has any authority to come and tell us what to do as long as you have not closed the deal with him, but they are wanting it for nothing. The Harts are schemers and they will beat you if they can. If you don't want to take my word you can ask anyone around here and they will tell you the same. * * * I don't know anything about your deals or bargains, but a fellow wants to be careful what they sign. * * * So you be careful of the Harts. I know you was believing all they were telling you when you were here, but I didn't say anything, as I didn't think you would believe me if I told you they are all so crooked * * *. Now don't think I am telling you this just to fill you full, but its for your own good. If Skip buys the place it is O. K. with us. * * * If he would get it on contract he would get all he could off of it and then let it slide. They are schemers so you be careful. * * *"

On October 10, 1942, the tenants wrote Mrs. Winters a second letter stating, inter alia: "Your letter came yesterday and I was sure glad to hear from you. So I'll write you a line and let you know that what the Harts are trying to pull is all bunk I think they are trying to get something for nothing. * * * He [plaintiff] hasn't got anything in the first place to buy with and I know no one would back him to the full amount as he hasn't anything but that place he lives on and he won't work so that is really why he is trying to get hold of the crops and resell and make some easy money that's his game. * * * If I had your letter when Skip came here the other day I would of run him off, so he had better make himself scarce here. * * * Well I guess this is enough about the

Harts, but we will see they get away with nothing. * * * The place looks nice now. We have more hay than any place near us. * * * Dennis said if the place is not sold before our lease expires he would take it again if you will let him have it. * * *"

In the fall of 1942, upon plaintiff's failure to obtain his proposed loan or pay the taxes or otherwise comply with his contract, Mrs. Winters paid the taxes and sold the landlord's share of the crops. In the spring of 1943 she entered into a new lease agreement with her tenants for the ensuing year.

The deposition of Mrs. Winters was taken and introduced at the trial. Therein she deposed that she had been advised that plaintiff "had not completed a loan with anyone, and Mr. Parcells, his attorney, authorized me to go ahead and lease the place for 1943" and this she did. Such testimony stands in the record undisputed.

Mrs. Winters further deposed that she made written demand upon plaintiff's attorney, Mr. Parcells, for the return to her of her contract and the escrow deed theretofore deposited in the bank, but that her demand bore no fruit and the papers were not returned. This testimony likewise stands undisputed.

On November 27, 1942, Mrs. Winters paid the 1942 taxes on the land in full and the county treasurer issued his official tax receipts therefore in the aggregate amount of $111.51. The payment was made three days before such taxes would have become delinquent.

On his cross-examination at the trial plaintiff testified:

"Q. Now, you also promised in this contract that you would pay the taxes for 1942, did you not? A. I did.

"Q. Did you ever pay the taxes for 1942? A. No.

"Q. Did you ever pay the taxes for 1943? A. No.

"Q. For 1944, or for any other year? A. No.

"Q. Then when you answered your attorney and said you complied with all the terms of the contract do you wish to qualify that now to the fact that you never paid the taxes for 1942? A. No.

"Q. Or for any other year? A. No. * * *

"Q. Did you take possession of the place in 1943? A. No sir.

"Q. Or at any other time? A. No sir. * * *

"Q. And you testified the loan was never made didn't you? A. The loan had never been completed. * * *

"Q. What did you do, if anything to go on trying to complete the loan? Did you do anything further? A. I was waiting for Mrs. Winters—

"Q. You, yourself, didn't do anything did you? A. I left it entirely up to Mr. M. L. Parcells.

"Q. You didn't make any further effort about the loan during 1943, and 1944, did you? A. Mr. M. L. Parcells can tell you more than I can.

"Q. I am asking you if you did? A. No. * * *

"Q. Did you have any money to buy the property in the fall of 1942? * * * A. I had some money.

"Q. How much of the purchase price did you have of your own and how much would you have to borrow? A. In 1942, I was borrowing the full amount? * * *

"Q. When did you go over and tell Mrs. Barron, Mr. Barron, or both, you had bought the place and demanded possession of it? A. That was shortly after the contract had been returned to the bank.

"Q. That would be the last days of August, 1942, or the first days of September, 1942, would it? A. That is right. * * *

"Q. When you demanded part of the hay, at that time you had not completed the loan, had you? Just answer 'yes' or 'no.' A. No.

"Q. You had not paid the taxes for 1942, had you? A. No.

"Q. Isn't is a fact that you were to pay the taxes in return for receiving that year's part of the rent, wasn't that your understanding? A. I was to pay the taxes.

"Q. You didn't do it did you? A. No, I didn't do it.

"Q. Mr. Barron told you you had no right there, that you had no hay? A. That is right.

In her deposition Mrs. Winters made answer to certain direct

interrogatories as follows: "Question 12. Did Edmond F. Hart ever pay you the $100.00? Answer 12. No. Question 13. Did Hart ever pay the taxes for the year 1942 or for any other year? * * * Answer 13. No. Question 14. Who received the landlord's share of the rent for the years 1942, 1943, and 1944? Answer 14. I received the landlord's share of the rent for the years 1942, 1943 and 1944. Question 15. Did Hart ever demand the landlord's share of the rent from you? * * * Answer 15. No. Question 16. Did Hart ever procure a loan on the place? * * * Answer 16. No, not to my knowledge. Question 17. Did Edmond F. Hart ever pay to you the $5,700.00? * * * Answer 17. No. Question 18. Did you ever deliver the deed which was left in escrow to Edmond F. Hart? * * * Answer 18. No, I did not. Question 19. Did you ever authorize anyone else to deliver it to him? * * * Answer 19. No, I did not. * * * Question 24. Did you ever demand the return of the deed and contract to you? * * * Answer 24. Yes. * * * Question 25. What was done relative to the property after Mr. Hart failed to get the loan and close the deal in the fall of 1942? * * * Answer 25. Nothing was done. I sold the landlord's share of the crop for 1942. * * * I rented the place again to Mr. and Mrs. Barron and continued to rent the place and collect the landlord's share of the crop until the fall of 1945, when I sold the place to Dennis Barron and Irma Barron, and gave them a warranty deed conveying the title to the property in fee."

To certain cross-interrogatories Mrs. Winters made answer: "Question 14. Were you ever advised Edmond F. Hart was unable to complete a farm loan with the Federal Land Bank? Answer 14. Yes, I was advised that Edmond F. Hart had not completed a loan with anyone, and Mr. Parcells, his attorney, authorized me to go ahead and lease the place for 1943. Question 15. When and by whom were you so advised? Answer 15. Mr. Parcells, and mostly by the fact that Mr. Hart did not pay the taxes for 1942." This testimony likewise stands undisputed.

On October 3, 1945, by warranty deed that day made, executed, acknowledged and delivered by Mrs. Winters and her hus-

band, grantors, to the defendants, Dennis Barron and Irma Barron, grantees, in the law offices of George Snell, Esq., in Billings, Montana, said grantors granted, sold and conveyed all of the described land to defendants.

On October 5, 1945, the plaintiff and his attorney, Mr. Parcells, having learned of the sale and conveyance to defendants, journeyed to Billings where they conferred with attorney Snell regarding the sale to defendants.

On cross-examination plaintiff testified:

"Q. Were you in Billings with Mr. Parcells on the 5th day of October, 1945? A. I was.

"Q. And at that time did you see Mr. Snell and * * * A. I did.

"Q. Were you with Mr. Parcells when you saw Mr. Snell? A. Yes.

"Q. At that time, in a conversation between you and Mr. Parcells and Mr. Snell, did Mr. Snell tell you that Mrs. Winters sold the place to Mr. Barron, or words to that effect? A. He didn't tell me, in fact I wasn't listening to any of the talk, Mr. Parcells did the talking, that is all I could tell you.

"Q. Did you hear any of the conversation? A. No, not to my knowledge.

"Q. Did Mr. Parcells, your attorney, tell you what conversation he had with Mr. Snell? A. Not to my knowledge.

"Q. Did he tell you Mr. Snell told him Mrs. Winters sold the property to Mr. Barron? A. I knew that before I went down there.

"Q. Where did you find that out? A. Mr. Parcells told me that.

"Q. He told you that before you went down there? A. That is right. * * *

"Q. Very well. Did you, after that time, and between that and the morning of the 6th of October, 1945, at 6:30, or 6:23 of that day procure a deed from the bank? A. No.

"Q. Do you know whether it was taken from the bank? A. I don't know.

"Q. You don't know anything about that? A. No.

"Q. You don't know if the deed has been recorded or not? A. I know it was recorded.

"Q. The deed was never delivered, was it to you, either by the bank or Mrs. Winters? A. No.

"Q. Have you seen that deed since that date? A. No.

"Q. You don't have the deed? A. No.

"Q. You never have had it? A. That is right."

Following his conference of October 5, 1945, with Attorney Snell in Billings, Mr. Parcells returned to Columbus and obtained from Irvin M. Black, cashier of the Yellowstone Bank of Columbus, the escrow deed theretofore held by the bank and, thereafter, at the crack of dawn on the morning of October 6, 1942, Mr. Parcells presented such escrow deed to the county clerk and recorder of Stillwater county for recording and such official endorsed thereon: "I hereby certify that the within deed was received for record this 6 day of October A. D. 1945 at 6:23 o'clock A. M. * * * Return to M. L. Parcells, $1.00."

That same day but during customary and regular office hours, sec. 4736, R. C. M. 1935, the county clerk and recorder received and filed for record at 10 o'clock a. m. on October 6, 1943, the deed which had theretofore been delivered to defendants in Mr. Snell's office at Billings.

On October 8, 1945, being two days after the deeds had been placed of record, the cashier of the bank issued the bank's draft for $5,422.10 payable to the order of Mrs. Esther Winters and forwarded same, with an accompanying letter, addressed to Mrs. Winters at Vallejo, California, but such draft, not being delivered, was returned to the bank. The bank's letter to Mrs. Winters read:

"In conformity with your instructions of September 2, 1942 supplemented November 5, 1942, we are closing the above escrow and enclose, herewith, our Federal Reserve Bank draft for $5422.10 in settlement of the account.

"The settlement figures as follows:

| "Purchase Price | | | $5800.00 |
|---|---|---|---|
| Less: | | | |
| 5% Commission Harry Raiff Est | $290.00 | | |
| Abstract | 67.60 | | |
| Revenue Stamps | 6.60 | | |
| One-half drawing papers | 5.00 | | |
| One-half Escrow | 2.90 | | |
| Collection Charge | 5.80 | 377.90 | |
| Balance due | | | 5422.10 |

"We will have the abstracter send you the receipted abstract bill.

"As we understand the deal, you received the crop but have received no interest on this account. This part of the deal was not covered by the escrow and will be a matter of settlement between you and Mr. Hart. The deed and abstract have been delivered to E. F. Hart as per instructions.

"Thanking you for this business, we are

"Very truly yours,

"Irvin M. Black.

"Irvin M. Black, Cashier.

"cc: E. F. Hart."

Mrs. Winters' letter of September 2, 1942, to the bank above referred to; reads:

"Enclosed is a Warranty Deed and Contract of Deed between Esther Winters and Edmond F. Hart.

"I want these held in escrow until final payment is made to me.

"I also want to authorize you to the following: abstract fee, internal revenue stamps, agent's commission, half the escrow fee and half the expense of drawing the contract and deed, which is $5.00.

"It is understood in the contract of deed that Mr. Hart is to

pay the 1942 taxes and have possession of my share of this years crop.

> "Yours respectfully,
> "Esther Winters."

Mrs. Winters' letter of November 5, 1942, to the bank reads:

"It was in August I mailed you a warranty deed and contract of deed between Edmund Hart and myself. An enclosed letter instructing you to hold in escrow until final payment was made.

"At that time I instructed you Mr. Hart was to pay the 1942 taxes and have possession of my share of the years crop.

"I am now instructing you to pay the 1942 taxes as I expect to have possession of my share of this years crop.

> "Respectfully,
> "Mrs. Esther Winters."

On October 18, 1945, being but twelve days after the recording of the escrow deed, the plaintiff, Edmond F. Hart, by his counsel, M. L. Parcells, commenced this action to quiet title as against the defendants, Dennis Barron and Irma Barron.

*The Pleadings.* The pleadings were heretofore considered by this court as in our reported opinion in State ex rel. Barron v. District Court, 119 Mont. 344, 174 Pac. (2d) 809-811.

*Complaint.* The complaint alleges: "I. That plaintiff is now *and for a long time hitherto has been the owner of the fee simple absolute record title,* entitled to the possession of and claims title to that certain tract, piece or parcel of land situate, lying and being in the County of Stillwater, State of Montana, described as:" (Here appears a description of the land.) "II. That the defendants assert and claim an estate in or ownership of said lands adverse to plaintiff. III. That the claim or claims of said defendants are without authority of law and invalid and without any right whatever; that the said defendants have no estate, right, title or interest whatever in said lands and premises, or any part thereof, but that the same and the assertion thereof constitutes a cloud upon the title of plaintiff thereto." (Emphasis supplied.)

*Answer.* In their answer defendants admit that they have

362

an estate in the described land; aver that they are the owners of the fee simple title thereto and in possession of all thereof and deny all the other allegations of the complaint. The answer also sets forth a cross-complaint containing two causes of action, the first being to quiet title in defendants under section 9479, R. C. M. 1935, and the second, to clear defendants' title from the cloud created thereon by the recording of the escrow deed to plaintiff.

*Reply.* In his reply plaintiff admits that the execution and delivery in escrow of the deed upon which he relies "was under and pursuant to an agreement wholly in writing and not otherwise," being the contract of August 28, 1942, a copy of which is attached to his reply, but denies most of the other allegations of defendants' cross-complaints.

Under such pleadings the contract which here controls is the contract prepared by plaintiff's attorney which plaintiff signed and then caused to be mailed to Mrs. Winters for execution.

The reply also pleaded a so-called "cross-complaint" whereby ▉ plaintiff sought to broaden the scope of his complaint, to add thereto and to incorporate therein a wholly new ground of relief. Such pleading is neither proper nor permissible under our Codes. Crenshaw v. Crenshaw, Mont., 182 Pac. (2d) 477, and State ex rel. Barron v. District Court, supra.

Subsequent to our decision in State ex rel. Barron v. District Court, supra, the trial court sustained defendants' demurrer to plaintiff's pretended "cross-complaint" and the cause then proceeded to trial before the court sitting without a jury. After hearing the evidence the court made written findings of fact and conclusions of law and rendered decree for plaintiff, from which decree defendants have appealed.

This is an equity case. On appeal here this court reviews all ▉ questions of fact arising upon the evidence presented and determines such questions of fact as well as the questions of law, unless, for good cause, a new trial or the taking of further evidence is ordered in the court below. Sec. 8805, R. C. M. 1935; Bordeaux v. Bordeaux, 32 Mont. 159, at page 165, 80 Pac. 6, at page 8; Wertz v. Lamb, 43 Mont. 477, at page 484, 117 Pac. 89.

Defendants rest their title and right to the land upon the deed delivered to them on October 3, 1945, and filed for record October 6, 1945, at ten o'clock a. m., while plaintiff bases his claim to title upon the escrow deed which his attorney procured from the bank and filed for record on October 6, 1945, at 6:23 o'clock a. m. with full knowledge that deed to the same land had theretofore been delivered to defendants.

*The Issue.*   The determinative question is: Which deed conveyed title?

The abstract of title furnished the plaintiff shows: Esther Garrigus Winters acquired the fee simple title to the land through the will of her sister, Mary Frances Garrigus, deceased. Mary Frances Garrigus, while owner of the fee, died leaving a last will and testament dated November 20, 1918, wherein she named her sister, Esther Garrigus Winters, as sole devisee. The will was duly admitted to probate in the district court of the fourth judicial district of the state of Montana in and for the county of Missoula. The said estate was duly administered and on January 3, 1920, decree of distribution was entered distributing all of said land to Esther Garrigus Winters.

No appeal was taken from such decree of distribution and upon the expiration of the time allowed by law for perfecting an appeal the decree became final and continuously thereafter to October 3, 1945, Esther Garrigus Winters was the owner of record of the fee to the land and had and held merchantable title thereto.

*Garrigus Affidavit.*   On October 2, 1942, there was filed in the office of the county clerk and recorder of Stillwater county and recorded in book 25, page 7 of the Miscellaneous Records, an affidavit which recites: "W. B. Garrigus, being first duly sworn, on oath, deposes and says: That he is a legatee and devisee mentioned in that certain will of Mary Frances Garrigus dated November 20, 1918, and probated in the District Court of the Fourth Judicial District, County of Missoula, Montana; that affiant, under terms of said will and the proceedings in said estate, does hereby assert and claim that he owns an interest in and to

the real estate mentioned in said Will, which real estate consists of approximately 160 acres of land known as the 'Garrigus Ranch' and located on the Stillwater River about one and one-half miles east of Absarokee, Stillwater County, Montana, said land being more particularly described as the W½SW¼, NE¼-SW¼, SE¼NW¼, sec. 30, Towp. 3 South, Rge. 19 East, Stillwater County, Montana. W. B. Garrigus.''

The affiant, W. B. Garrigus, now deceased, was the father of Mary Frances Garrigus and Esther Garrigus Winters.

Approximately one month elapsed from the signing by plaintiff of the contract and the filing of the Garrigus affidavit, during which time plaintiff had performed no part of the contract. Notwithstanding, plaintiff attributes his failure to comply with the terms of his contract to the filing of the affidavit and thus attempts to excuse and justify his noncompliance. This he may not do. The question is one of performance, not of ability or lack of ability to perform. 19 Am. Jur., Escrow, section 20, page 438, notes 16-18. The purchaser may not tender the affidavit in lieu of the cash payments which he had contracted to make.

There is no provision of law that authorizes the filing of the affidavit, nor is there any provision that would enable one to convey, encumber or otherwise cloud the title to real estate by such filing, nor does such affidavit constitute notice, either actual or constructive of any adverse claim or ''interest in and to the real estate mentioned in said Will,'' wherein affiant asserts he was mentioned as ''a legatee and devisee.''

By express statute the decree of distribution entered January 3, 1920, ''is conclusive as to the rights of heirs, legatees, or devisees, subject only to be reversed, set aside, or modified on appeal.'' Sec. 10328, R. C. M. 1935. If dissatisfied with the distribution made, the affiant, W. B. Garrigus, was required to appeal within sixty days after the decree was made or entered or filed with the clerk or be concluded thereby. See subd. 3, sec. 9731, subd. 4, sec. 9732, R. C. M. 1935; Harrison v. Cannon, 122 Mont. 318, 203 Pac. (2d) 978.

The affidavit is void on its face. The pretended "claim" attempted to be asserted will not admit of proof for under the law the affiant and all claiming under him, are concluded by the distribution made in the decree and they had been so concluded for more than 22 years prior to the filing of the affidavit. Being void the affidavit cast no cloud. It was and is nothing. It would have been but idle shadow boxing against the W. B. Garrigus affidavit "to probate his estate and sue to quiet title on this land" as demanded in the bank's letter of April 16, 1945, to Mrs. Winters. The law neither does nor requires idle acts and it disregards trifles. Sections 8761 and 8762, R. C. M. 1935.

In 78 A. L. R. at pages 24 to 311 there appears an exhaustive note on "Cloud on Title" and at page 62 thereof it is said: "It has been held by a majority of the courts that no cloud exists if the instrument or proceeding is void on its face, or will be *shown to be void by the evidence* which must be shown to support it." (Emphasis supplied.) Among the cases cited as supporting the quoted statement is Poulos v. Lyman Bros. Co., 63 Mont. 561, 567, 208 Pac. 598, 599, where this court construed sections 8733 and 8734, R. C. M. 1935 and said: "If the instrument is void on its face or on the face of another instrument which is necessary to the use of the former in evidence, it is incapable of causing injury and does not cast a cloud. Section 8734, Rev. Codes 1921." Also see: Cohen v. Sharp, 44 Cal. 29; 44 Am. Jur., Quieting Title, p. 13, sec. 13, notes 17, 18 and 19.

In Washoe Copper Co. v. Junila, 43 Mont. 178, 183, 115 Pac. 917, 918, this court correctly said: "That a void instrument cannot impart constructive knowledge to any one is elementary * * *." The recording of an instrument not in compliance with law is a mere nullity and a subsequent purchaser is affected only by such actual notice as would amount to a fraud. 8 Thompson on Real Property (Perm. Ed), p. 152, sec. 4342.

In response to her demand for a return of the escrow papers, Mrs. Winters received the following letter dated November 12, 1942, from plaintiff's attorney:

"Dear Mrs. Winters:

"Replying to your letter of November 9, will say the only delay in closing your deal with Mr. Hart is that occasion by failure of title offered to meet the requirements of the Federal Land Bank.

"I am enclosing herewith a letter from the Secretary Treasurer at Billings which is self explanatory. It seems that Mr. Garrigus must have heard of the deal and filed the affidavit. *Personally I do not think he has any claim whatsoever against the land, and in my opinion there is no question but what an action could be maintained by you to quiet the title and to cancel any possible claims which he might assert.*

"As soon as your title to the land is clear, Mr. Hart is ready to close the transaction in accordance with the terms of the contract.

"By signing the papers and accepting the down payment, you obligated yourself to furnish clear title to the property and cannot now refuse to sign the deed which you have already signed and deposited with the bank for delivery upon payment of the purchase price.

"I am not in a position to represent you in the matter of any controversy between you and Hart as he has asked me to look after his interests in the matter of closing the loan with the Federal Land Bank. Aside from this, I am free to do anything you may suggest to expedite the closing of the transaction.

"Awaiting your further pleasure or instructions, I am,

"Yours respectfully,

"MLP :SM                                M. L. Parcells.

(Emphasis supplied.)

It would appear that the above letter indulges in considerable "beating about the bush" in an attempt to hold Mrs. Winters to a contract which plaintiff had wholly failed to perform. Of course, Mrs. Winters could not refuse to sign the deed which she had already signed and deposited with the bank for delivery upon payment of the purchase price, but upon the failure of plaintiff to pay the purchase price within a reasonable time

after he entered into the contract, Mrs. Winters most certainly had the right to declare the deal off and demand a return of the escrow deed. The letter urges that by "accepting the down payment" Mrs. Winters obligated herself, but Mrs. Winters had neither received nor accepted any "down payment" on the contract as the record shows and as plaintiff's attorney well knew.

Two months later, January 12, 1943, plaintiff's attorney again wrote Mrs. Winters as follows:

"Dear Mrs. Winters:

"I have your letter of January 7th, 1943 in reference to your real estate contract made with Mr. E. F. Hart, and have gone over the same with him.

"He feels that you are mistaken as to the source of information given to the Barrons, as the affidavit of Mr. Garrigus was filed on October 2nd, 1942, while you advised your first letter from Mrs. Barron was written on October 8th.

"*I agree with you that Mr. Garrigus has no legal title to or claim of any interest in this land, but it will require an action in Court to quiet the title in you or determine that he has no such legal claim,* and Mr. Hart feels that under his contract with you he is entitled to a deed with abstract showing free and merchantable title, and is insisting that you comply with this agreement.

"As I wrote you before, he is ready to comply with the terms of the contract on his part as soon as you can deliver the title agreed would be conveyed.

"Yours respectfully,

MLP/ma                                        M. L. Parcells."

(Emphasis supplied.)

Thereafter more than two years passed during which there was no compliance whatever by plaintiff with the terms of his contract.

On April 16, 1945, the depository bank wrote Mrs. Winters as follows:

"Dear Mrs. Winters:

"Reference is made to contract for deed, made under date of

August 28, 1942, between yourself and Edmond F. Hart, of Absarokee, Montana.

"Mr. Hart has today deposited with us the full purchase price shown on this contract, amounting to $5800.00, and has advised us that he now wishes to go ahead under the terms of his contract with you.

"It is our understanding that this deal has been held up due to the filing of a claim to a share of the estate of your sister by your father, Mr. Garrigus, and since Mr. Garrigus is now deceased, *it will no doubt be necessary to probate his estate and sue to quiet title on this land.*

"Mr. Hart would appreciate your early attention in clearing this title, and *we suggest that you write to Mr. M. L. Parcells, attorney at law, of Columbus, who would be glad to assist you in clearing the title, as he is familiar with this case and the steps necessary to be taken.*

"Very truly yours,
"Irvin M. Black,
"Cashier."

"IMB/ts"
(Emphasis supplied.)

Mrs. Winters had not obligated herself to probate her father's estate nor to prosecute an action to remove any pretended "cloud" based upon the invalid and void claim of her deceased ancestor and most certainly she had not agreed to the deposit of the purchase price with a lot of strings attached which effectively withheld the money from her reach. Her contract was simply to furnish an abstract of title and to convey the land "by good and sufficient deed with full covenants of warranty."

The contract of August 28, 1942, between plaintiff and Mrs. ▮ Winters must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. Sec. 7527, R. C. M. 1935. It must receive such interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done, without violating the

intention of the parties. Sec. 7534, R. C. M. 1935. It is to be interpreted according to the law and usage of the place where it is to be performed. Sec. 7537, R. C. M. 1935. It extends only to those things concerning which it appears that the parties intended to contract. Sec. 7539, R. C. M. 1935. It "may be altered by a contract in writing, or by an executed oral agreement, *and not otherwise.*" Sec. 7569, R. C. M. 1935. (Emphasis supplied.)

As before stated, the contract was prepared by plaintiff's attorney and, after being signed by plaintiff, was mailed to Mrs. Winters for her execution. If any uncertainty exists in such contract it is to be interpreted most strongly against the plaintiff promisor who caused such uncertainty to exist. Sec. 7545, R. C. M. 1935. "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly —as, for example, if it consists in the payment of money only— it must be performed immediately upon the thing to be done being exactly ascertained." Sec. 7548, R. C. M. 1935.

Applying the foregoing statutory rules of interpretation to the contract it is apparent that plaintiff obligated himself: To pay to the seller $100 "at or before execution of this contract;" to "pay 1942 taxes" and to pay the balance of $5,700 "on approval of title and completion of loan applied for by" plaintiff. There being no time stated in the contract for the "completion of loan applied for" by plaintiff, under the law he had a reasonable time in which to complete the loan and fully perform his contract and it was not the intention of the parties that such reasonable time would extend beyond March 1, 1943, at which time the lease on the land was to expire and plaintiff was to take over and "have possession."

The deposit of $5,800 represented to have been made by the purchaser on April 16, 1945, with strings attached to it so that the money could not and would not be paid to the vendor did not comply with the provisions of the contract. The money was not deposited with the escrow holder for the account of the

vendor at the time the alleged deposit of April 16, 1945, was made but was only to be so applied when the vendor had probated her father's estate and after she had obtained a decree removing the pretended "cloud" asserted in her father's void claim. Pending the completion of such proceedings and action, title to the deposit remained in the purchaser and the escrow holder held the deposit in trust for the purchaser and the seller had no claim to it. Hildebrand v. Beck, 196 Cal. 141, 236 Pac. 301, 39 A. L. R. 1076; 39 A. L. R. note 1080; Widess v. Title Insurance & Trust Co. & Doane, 112 Cal. App. 343, 296 Pac. 899; Hastings v. Bank of America Nat. Trust & Savings Ass'n, 79 Cal. App. (2d) 627, 180 Pac. (2d) 358; King v. Smith, Cal. App., 193 Pac. (2d) 762.

In 30 C. J. S., Escrows, secs. 9, 10, 11, at pages 1206-1212, it is said, "Where an instrument has been placed in escrow, the transaction constitutes a contract between the parties. * * * Until the performance of the condition the legal title to land to be conveyed by the instrument remains in the grantor, and it is generally held that no estate or interest vests in the grantee; * * *" sec. 9, pages 1206, 1207. "Where an instrument is deposited as an escrow, it cannot become operative until the conditions on which it is deposited have been performed or the contingency agreed on has happened, and the fact that the grantee has gone into possession of the land to be conveyed does not alter the rule. * * * Generally, courts hold a grantee or an obligee to a very strict compliance with the conditions imposed. A part performance has no effect on the status of the instrument; an entire performance of the condition is necessary." Sec. 10, pages 1208, 1209. "Since the performance of the condition or the happening of the contingency is essential to a valid delivery of an escrow by the depositary to the grantee or obligee, see supra sec. 10, it follows that a delivery or transfer before the performance of the condition or the happening of the contingency is unauthorized, and that if the grantee or obligee obtains possession of the instrument before such performance he acquires no right or title thereby, even though he or another

records the instrument. Wrongful delivery by the depositary does not make the deed or other instrument operative in the hands of the party so obtaining it; nor does it increase in any way the rights of the grantee." Sec. 11, pages 1211, 1212.

In 19 Am. Jur., "Escrow," at pages 426-441, it is said: "Where an instrument has been delivered to a depositary as a writing or escrow of the grantor, it does not become a deed, and no legal title or estate passes until the condition has been performed or the event has happened upon which it is to be delivered to the grantee or until the delivery by the depositary to the grantee * * *" Sec. 11, p. 426. "In the law governing performance of escrow agreements, there is no doctrine of substantial compliance to be found. Compliance must be full and to the letter, or else it constitutes merely noncompliance. Strict and full performance only can discharge a condition precedent to valid delivery by the escrow holder. The question involved is one of performance of the escrow agreement, not of the ability of the parties to perform the agreement, since such ability, without full performance, cannot amount to compliance. Accordingly, it has been held that the ability of a party to an escrow agreement to pay in cash the amount of cash payment called for by the agreement is immaterial, where such party simply deposits his check instead of the cash, so far as the right of the depositary to thereupon deliver the deed is concerned, since such ability without full performance cannot amount to compliance. It has also been held that a vendor, when depositing a deed can, without awaiting the vendee's consent, annex such conditions thereto as he may see fit, and the vendee is entitled to a delivery thereof only upon a strict compliance with the requirements constituting the conditions precedent to the transfer of the title. The specified conditions on which an instrument is deposited constitute the depositary as the trustee of an express trust, with duties to perform for all the parties which duties none can forbid without the consent of the rest. This principle has been extended to a case where the grantor deposited his deeds in escrow for delivery to the grantee on certain conditions, which were directly

in violation of the conditions on which he had contracted in writing to deposit them. As a result it has been held that the original contract non obstante, the grantee, whatever other his remedies might be, is not entitled to the deeds from the depositary until performance of the conditions stipulated by the grantor on the lodgment." Sec. 20, p. 438. "Where an instrument is placed in escrow with no specified time within which the condition shall be performed, such lack of specification does not constitute any uncertainty, since by implication, the performance must be within a reasonable time." Sec. 20, p. 439. "It is the general rule that where an instrument placed in escrow is thereafter delivered by the escrow holder in violation of, or without compliance with, the terms or conditions of the escrow agreement, such attempted delivery is inoperative and no title or rights pass by virtue of the second tradition, for the reason that in legal contemplation there has been no effective delivery." Sec. 21, p. 439. "The recording of an escrow by a depositary before the performance of acts required by the escrow agreement as a condition of the delivery of the instrument does not constitute a delivery so as to transfer title. Hence, the mere fact of any person, even the depositary himself, surreptitiously or fraudulently recording the deed or getting it recorded does not give such deed efficacy, and the cloud on the grantor's title thereby created will be canceled by a court of equity. A delivery by a depositary of documents or money to a person who has failed to perform the conditions of delivery provided by an escrow agreement constitutes a conversion of the property." Sec. 21, p. 441.

As was said by the Supreme Court of California: "The bank in this action stands in no different position than that of an ordinary stakeholder. It has not assumed any obligation to settle the disputes which have arisen between the parties to the escrow, and, if it should attempt to do so, and should deliver the property held by it to either of the parties not entitled thereto, the rightful owner of said property can hold the bank liable for the value of the property so wrongfully delivered." Security

Trust & Savings Bank v. Carlsen, 205 Cal. 309, 316, 271 Pac. 100, 103, 470, 60 A. L. R. 630, followed and approved in King v. Smith, supra. Also see: Annotations in 48 A. L. R. 405 and 54 A. L. R. 1246.

The only instructions given the bank for the handling of the escrow are to be found in: (a) The contract of sale and purchase; (b) Mrs. Winter's letter to the bank of September 2, 1942, stating: "I want these held in escrow until final payment is made to me;" and (c) Mrs. Winters' letter to the bank of November 5, 1942, instructing the bank to pay the 1942 taxes as Mrs. Winters would retain possession of the 1942 crops. Plaintiff had not complied with his contract at the time the bank handed the escrow deed over to plaintiff's attorney, Mr. Parcells, and the bank surrendered the deed in violation of the provisions of the contract and the instructions given it by Mrs. Winters.

At the time plaintiff's attorney procured the deed from the bank he and plaintiff had actual knowledge: (a) That a couple of days previous, in Attorney Snell's office at Billings, Yellowstone county, Montana, Mrs. Winters and defendants had consummated a deal whereby Mrs. Winters had sold and, by deed there made and delivered, had passed title to the land to defendants; (b) that such deed to defendants had not yet been placed of record in Stillwater county, wherein the land is situate; and (c) that Mrs. Winters was then in no position to accept any money from plaintiff nor to deliver deed conveying title to plaintiff. The procuring and recording of the escrow deed under such facts, could only lead to trouble and litigation for all parties concerned.

The bank, knowing of plaintiff's noncompliance with his contract, was wholly without authority to surrender the escrow deed to plaintiff's attorney, who with soiled hands, reached for such deed and, upon procuring it, raced to the court house to place it of record ahead of the recording of the deed to defendants which both plaintiff and his attorney then knew had been delivered to defendants some three days previous. As is said in Rosenthal v. Landau, Cal. App., 202 Pac. (2d) 810, at page 812:

"The dates upon which the various deeds were recorded are false factors in the case." The unauthorized delivery of the escrow deed passed no title and serves only to wrongfully cloud defendants' title to the property.

Mrs. Winters having declined to waive plaintiff's noncompliance and having elected to sell and convey the land to defendants, the contract of August 28, 1942, was rightfully rescinded, terminated and at an end.

The deed of October 3, 1945, passed title to defendants who are now the owners in fee simple of all the described land free and clear from any and all encumbrances, claims or demands of or by plaintiff or any person claiming under him. Defendants' title is good and valid and should be quieted. Plaintiff has no right, title or interest in or to said land and is forever barred and enjoined from asserting any claim, demand or pretense whatever thereto and the deed from Mrs. Winters, grantor, to plaintiff, Edmond F. Hart, grantee, dated August 28, 1942, filed for record October 6, 1945, at 6:23 o'clock a. m. and recorded in the office of the county clerk and recorder of Stillwater county, Montana, in Volume 38 of Deeds at page 583, canceled as null, void and of no effect.

The findings of fact, conclusions of law and decree of the trial court are against the evidence and contrary to the law and, therefore, ordered vacated. The decree is reversed and the cause remanded to the district court for findings of fact, conclusions of law and decree for defendants and against plaintiff in conformity with this opinion, defendants to be awarded their costs, and it is so ordered.

Associate Justices Angstman, Freebourn and Bottomly concur.

MR. JUSTICE METCALF:

I concur in the foregoing opinion. However I adhere to the opinion expressed in my dissent in Miller v. Miller, Mont., 190 Pac. (2d) 72 as to the powers of this court in reviewing an equity case.