Harry Franklin FERGUSON and Jean
Louise Ferguson, Appellants,

v.

Ida C. CASPAR et al., Appellees.

No. 7666.

District of Columbia Court of Appeals.

Argued May 28, 1974.

Decided June 17, 1976.

John W. Karr, Washington, D.C., for
appellants.

Henry H. Brylawski, Washington, D.C., for appellee Caspar.

Thomas Penfield Jackson, Washington, D.C., for appellees McAteer.

Before REILLY, Chief Judge, and KERN and HARRIS, Associate Judges.

REILLY, Chief Judge:

One of the most formal transactions known to the law is the transfer of title to real estate. In order to insure finality to such transactions, the practice in this jurisdiction is for the contracting parties, including the lienors and lienees, after they are satisfied with the report on title search, to meet with one another in the office of a title company, agree on the apportionment of outstanding taxes and other charges, and execute and deliver the conveyances (deeds) necessary to close the transaction. Such a meeting, popularly called a "closing" or a "settlement", precedes the transmission by the title company of the conveyancing instruments to the Recorder of Deeds for permanent entry into the official land records.

Although hundreds of such settlements occur every year in the District of Columbia, it is seldom indeed that the parties conduct themselves in such a way as to taint the finality of the "closing." The case before us stems from one of these uncommon situations and raises the question as to what point in a settlement proceeding finality attaches.

This is an appeal from a judgment and order of the trial court dismissing an amended complaint and granting judgment in favor of the appellees after trial by the court without a jury in an action brought by the contracting purchasers—appellants—for a declaratory judgment and for specific performance of a contract for the sale of real property in this city. To bring the issues in this controversy into perspective, a brief resume of the salient facts is in order.

Appellee Mrs. Ida Caspar was the owner of an unrestored row house in the Capitol Hill area.[1] On November 18, 1972, she entered into a contract for the sale of the premises to the appellants for the sum of $23,000.00 payment of the purchase price to be made in cash at the time of settlement. Settlement was to be made at the office of the Lawyers Title Insurance Corporation on or before February 1, 1973. The contract of sale included a provision that the seller would convey the premises free of all notices of municipal violations existing at the date of the contract, such provision to survive the delivery of the deed.[2] On October 13, 1972, Mrs. Caspar had been personally served with a deficiency notice by a District of Columbia housing inspector informing her that there existed 126 Housing Code violations upon the premises and calling for their correction within 60 days.[3] Subsequently, Mrs. Caspar, upon her written request, obtained an extension of time for compliance to January 25, 1973.[4]

Early in January, 1973, the appellants became aware of the existence of the Housing Code violations but did not bring this matter to the attention of the seller. Instead, they obtained an estimate of $6,125.00

---

1. The dwelling was leased to one Eubanks, who was operating the premises as a rooming house.

2. The printed clause in the contract provided:

   All notices of violations of Municipal orders or requirements noted or issued by any department of the District of Columbia, or prosecutions in any of the courts of the District of Columbia on account thereof against or affecting the property at the date of this contract shall be complied with by the seller and the property conveyed free thereof.

   This provision shall survive the delivery of the deed hereunder.

3. Without Mrs. Caspar's knowledge or consent, Eubanks had applied for a rooming house Certificate of Occupancy. The subsequent inspection by the Housing Department resulted in the noted violations, a copy of which was served upon Mrs. Caspar as the record owner of the premises.

4. Mrs. Caspar sought the delay in order to terminate the tenancy. Eviction proceedings were instituted and the premises were finally vacated by January 23, 1973.

from a housing contractor as the cost of correcting the deficiencies.[5] The notice of violations was still outstanding at the time of settlement.

By agreement, the parties met at the office of the Lawyers Title Insurance Corporation for settlement on the afternoon of February 1, 1973. Mrs. Caspar was attended by her son and daughter who assisted their mother in business matters. The appellants were present with their attorney. The settlement officer, an employee of the title company, prepared settlement statements for the respective parties which each of them signed. In addition, the parties signed the requisite District of Columbia tax recordation forms. Mrs. Caspar executed and delivered her deed to the property to the settlement officer. The purchasers delivered to the settlement officer the personal check of Mr. Ferguson in the sum of $12,924.42 payable to the order of the title company, representing the balance due as set forth in the settlement statement.[6]

After the documents had been delivered to the settlement officer and as the parties were rising to leave, the attorney for the appellants handed separate letters to the settlement officer and to Mrs. Caspar's son. The letter addressed to the title company, after referring to the clause in the contract of sale requiring Mrs. Caspar to convey the premises free of any municipal violation notices, advised the title company that as of January 26, 1973, the outstanding Housing Code violations had not been corrected and that the purchasers had obtained an estimate in the amount of $6,125.00 to bring the premises into compliance. The letter concluded by stating:

> This is to put you on notice that purchasers are paying $6,125.00 of the purchase price to you as escrow agent to hold until seller has complied with the outstanding violation notices on this property. Written notice signed by the pur-

chaser shall be sufficient to discharge you from any further obligations with respect to this sum.

The letter directed to Mrs. Caspar informed her of the existence of the notice of the Housing Code violations and her obligation under the agreement to comply with the notice. It went on to state that the Fergusons had obtained an estimate of approximately $6,125.00 as the cost of repairing the premises and concluded as follows:

> This is to advise you that Fergusons intend to enforce the requirement that these violations be corrected. Accordingly, I have written Lawyers Title requesting that they withhold the above amount from the purchase price in an escrow account until you and the Fergusons have reached a final understanding as to the cost of making these corrections.

Upon receiving the letter directed to the title company, the settlement officer advised the parties that the company could not record the deed or withhold any funds without formal authority to hold any funds in escrow. He informed the parties that he could not proceed with the settlement since the contract of sale provided for payment in cash and there was no provision for withholding any funds in escrow. Mrs. Caspar's son suggested that the parties complete the settlement, have the deed recorded, and thereafter "work out or litigate" the question of the Housing Code violations. The attorney for the appellants recommended that Mrs. Caspar seek the advice of an attorney. The parties then dispersed without the matter being resolved.

On February 13, 1973, not having received any further word or instructions from the parties, the settlement officer wrote to the Fergusons, returning the personal check which had been presented at the settlement and informing them that the deed could not be recorded in view of their attorney's let-

5. The greater part of the work entailed plastering, painting, glazing and repairing windows and doors.

6. Appellants had previously deposited $1000.00 with the real estate broker and had a credit of $9,387.67 with the title company from refinancing their former residence. Tax adjustments and closing costs brought the balance due from them to $12,924.42.

ter directing the title company to withhold certain monies in escrow. Two days later, the Fergusons' attorney replied, returning the personal check to the settlement officer and insisting that the deed be recorded. This letter was received by the title company on February 16 and on the same day, the deed executed by Mrs. Caspar was returned to her son. On February 17, Mrs. Caspar signed a contract of sale for the premises to the appellees, John and Mary McAteer, and her deed to them was executed and recorded on February 23.[7]

On February 21, 1973, appellants filed a complaint against Mrs. Caspar seeking a declaratory judgment and specific performance of the contract of sale entered into between the parties. Subsequently, the complaint was amended to include the McAteers as parties-defendant. In her answer to the amended complaint, Mrs. Caspar alleged *inter alia* that the appellants had breached the contract of sale and were not entitled to specific performance. The case was tried before the court without a jury. At the close of all the evidence, the court granted appellees' motion to dismiss the complaint on the ground that the plaintiffs, by imposing conditions on their tender of payment of the purchase price, had failed to make an unconditional tender of full performance of the contract on their part and had forfeited their right to specific performance. On June 15, 1973, the trial court entered its Judgment and Order of Dismissal setting forth its Findings of Fact and Conclusions of Law.

On this appeal, appellants' principal contentions are that legal title to the property in question passed to them upon the settlement between the seller and purchasers and that the trial court erred in concluding that the appellants were not entitled to specific performance of the contract of sale by reason of their failure to tender the full purchase price for the property as required by the contract. We agree with the determination of the trial court and affirm.

■ The initial contention of appellants is based upon the erroneous conclusion that legal title to the property in question passed to them when the settlement statements were signed by the respective parties, the seller's deed delivered to the settlement officer, and the personal check of the purchasers for the balance due delivered to the settlement officer. In this conclusion, appellants misconstrue the nature and effect of the settlement proceedings engaged in between the various parties at the meeting. In their briefs on appeal, the appellants and appellees both infer that under the circumstances of this case the title company's position in the transaction was that of an escrow agent. Our study of the contract of sale and the proceedings which ensued at the settlement meeting confirms our understanding that, as is the usual and customary practice in real estate transactions in the District of Columbia where the parties employ a third party to accept their respective tenders of performance under the contract, a valid escrow arrangement is created and the title company serves in the capacity of an escrow agent in the transaction.

■ Generally, an escrow agreement is created in a formal contract between the parties, setting forth the conditions and contingencies under which the instruments deposited in escrow are to be delivered and to take effect. However, no precise form of words is necessary to create an escrow but it must appear from all the facts and circumstances surrounding the execution and delivery of the instruments that they were not to take effect until certain conditions are performed.[8]

A valid escrow agreement is a triangular arrangement. First there must be a contract between the seller and the buyer

---

7. The contract provided for the sale of the premises "as is" with the municipal violations clause stricken. The purchasers were to pay $25,000.00, payable $7,000.00 in cash and $18,000.00 in a purchase money deed of trust.

8. *Angelcyk v. Angelcyk*, 367 Pa. 381, 80 A.2d 753, 756 (1951); 28 Am.Jur.2d *Escrow* §§ 1, 3, 5 (1966); 30A C.J.S. *Escrows* § 4 (1965).

agreeing to the conditions of a deposit, then there must be delivery of the items on deposit to the escrow agent, and he must agree to perform the function of receiving and dispersing the items. The agreement by the seller and buyer to all the terms of the escrow instructions and the acceptance by the escrow agent of the position of depository create the escrow. [*Hoffman v. Eighth Judicial District Court,* 90 Nev. 267, 523 P.2d 848, 850 (1974). *See also Johansson v. United States,* 336 F.2d 809, 815 (5th Cir. 1964); *Home Insurance Co. of New York v. Wilson,* 210 Ky. 237, 275 S.W. 691, 693 (1925); *and compare Kennedy v. District-Realty Title Insurance Corp.,* D.C. App., 306 A.2d 655 (1973).]

In the case at bar, the seller and the purchasers agreed to make full settlement in accordance with the terms of the contract of sale at the office of Lawyers Title Insurance Corporation, the title company searching the title, and that " . . . deposit with the Title Company . . . of the purchase money, the deed of conveyance for execution and such other papers as are required of either party by the terms of this contract shall be considered good and sufficient tender of performance of the terms hereof." Significantly, the deed executed by the seller was delivered to the settlement officer. The purchasers' personal check, which included the balance of the purchase price, was made payable to the title company and delivered to the settlement officer. The deed was deposited with the settlement officer as an escrow agent with the implied understanding that delivery to the purchasers was not to be effected until the purchasers had complied with their obligation under the contract of sale to pay the amount due the seller as purchase money. On the other hand, the settlement officer was not free to disburse any of the funds deposited by the purchasers until the title company was assured that the seller's deed conveyed title "good of record and in fact". Thus, the settlement meeting was only the initial step in the transaction and until all the conditions of the contract had been fulfilled, the settlement was not complete.[9] Where a deed is deposited as an escrow, title does not pass to the grantee unless and until the condition of its delivery is performed.[10] Although the purchasers tendered their personal check for the balance due from them at the settlement in ostensible payment of the purchase price, their subsequent direction to the title company to withhold from the seller a substantial portion of the purchase money to which she was entitled created a deviation from the condition upon which delivery of the deed to them could be effected. The settlement officer informed the purchasers that the settlement could not be completed and the deed could not be recorded. Since the condition precedent to the delivery of the deed had not been fulfilled, legal title to the property did not pass to the purchasers.

Appellants point to the fact that settlement statements were signed by the respective parties as indicative that settlement between the parties had been completed. Each of these statements was a separate and distinct document, one being the seller's statement establishing the "AMOUNT TO BE PAID SELLER" and the other, the purchasers' statement indicating the "BAL-

---

9. The customary practice in settlments of this nature is for the title company to deposit the purchaser's check to assure that the check is honored. After the check clears and before recording the deed, the title company brings the title down to date by making a continuation title search from the date of its initial search to the date of recordation of the deed to assure that no liens or encumbrances have been filed against the property in the interim.

10. *County of Calhoun v. American Emigrant Co.,* 93 U.S. 124, 23 L.Ed. 826 (1876); *Ocean Shore Railroad Company v. United States,* 489 F.2d 532, 534 (9th Cir. 1973); *Andover Land Company v. Hoffman,* 264 Cal. App.2d 87, 70 Cal.Rptr. 38, 40 (1968); *Todd v. Vestermark,* 145 Cal.App.2d 374, 302 P.2d 347, 349 (1956); *Van Tassel v. Burger,* 119 App.Div. 509, 104 N.Y.S. 273 (1907); 28 Am.Jur.2d *Escrow* §§ 10, 28 (1966); 30A C.J.S. *Escrows* §§ 9, 13 (1965).

ANCE REQUIRED TO COMPLETE SETTLEMENT." The seller's statement contained an itemization of charges to be borne by the seller, including a charge for the apportionment of unpaid taxes, the brokerage fee to be paid to the real estate broker, disbursements to be paid to the broker for the costs of evicting the tenants, one-half of the recordation tax, and a charge of $50 to be held for water charges. These charges and anticipated disbursements were applied against the purchase price of the property and a balance struck, establishing the net amount which would be paid to the seller by the title company as the proceeds of the sale after the disbursements had been made and the settlement completed. The seller's signature on the statement noted her approval and acceptance of the statement as correct.

The purchasers' statement itemized the credits to their account, consisting of a credit for apportionment of unpaid taxes, the amount deposited with the broker as earnest money, and a credit to the purchasers of the sum to be received by the title company as the proceeds of the refinancing of other property owned by the purchasers. Against these credits, the purchasers were charged with the purchase price of the property and miscellaneous closing costs to be paid by them, including examination of title, title insurance, settlement fee, conveyancing fees, recording fees, and their share of the recordation tax. Offsetting the credits against the charges established a balance to be paid by the purchasers to the title company at settlement.

We do not attribute to these documents the significance which appellants attach to them. In effect, the seller's statement merely indicated what the seller would receive as the net proceeds of the sale after the settlement had been fully completed. The purchasers' statement was a statement of account of what remained to be paid by the purchasers to the title company, including the closing costs to be paid to the title company, after crediting the purchasers for the earnest money paid to the real estate broker and the sum anticipated to be received from the refinancing settlement. The incidental charges set forth on each statement were the concern solely of the party charged. Neither party bound himself to the settlement statement of the other. Neither statement constituted an acknowledgment that either the seller or the title company had received the purchase money which the purchasers were obligated to pay. The individual settlement statements were in effect an account stated separately between the title company and the seller and between the title company and the purchasers. Thus we reject the contention that the signing of the individual settlement statements by each of the parties signified that the transaction had been completed.

■ The appellants, contending that the settlement proceeding was completed, argue further that when the legal title to the premises passed to them the title to the purchase money vested in the seller and the subsequent demand by the purchasers that the title company withhold a portion of the seller's money was a "legal nullity" and "obviously unenforceable". In an escrow arrangement, the escrow holder is the dual agent of both parties until the performance of the conditions of the escrow agreement, whereupon he becomes the agent of each of the parties to the transaction in respect to those things placed in escrow to which each party has thus become entitled.[11] Thus, when the conditions specified in the escrow agreement have been fully performed, the title to the premises passes to the purchaser and title to the purchase money passes to the seller. Thereupon, the escrow holder becomes the agent of the purchaser as to the deed and of the seller as to the money. However, as we have pointed out *supra*, the settlement was not completed and

11. *Todd v. Vestermark, supra* n. 10; *Shreeves v. Pearson*, 194 Cal. 699, 230 P. 448, 451 (1924); 28 Am.Jur.2d *Escrow* §§ 11, 17, 28 (1966); 30A C.J.S. *Escrows* § 8 at 988 (1965); Restatement, Second, *Agency* § 14D (1958).

since the conditions upon which the seller's deed was to be delivered to the purchasers had not been performed, legal title to the property did not pass to the purchasers and title to the purchase money deposited with the settlement officer did not vest in the seller.[12]

Furthermore, we find it difficult to comprehend appellants' present contention that their written demand upon the title company was a "legal nullity" in view of their contrary position at the settlement meeting. Upon receipt of the written demand from appellants' attorney, the settlement officer notified the parties that under the circumstances he could not proceed with the settlement. At the same time, Mrs. Caspar's son suggested that the appellants permit the settlement to proceed and that thereafter the parties "work out" the question of the Housing Code violations. Nevertheless, the appellants persisted in their demand that a portion of the purchase money be retained in escrow by the title company. The impasse was not resolved and the meeting broke up. By making the demand upon the title company, appellants placed the company in the difficult position of having to determine the rights of the respective parties. If the company honored appellants' demand, the seller could complain that the company had breached its duty to her. If the company refused to comply with the demand, the appellants would charge the title company with having disbursed the purchase money contrary to their express direction. In either event, the title company would have risked being subject to legal action by the party aggrieved. After waiting a reasonable period for the parties to adjust their differences and not having received any further word from either of them, the title company terminated its escrow agency and returned the escrow instruments to the respective parties. This turn of events was brought about by appellants' actions in serving the demand upon the title company and in persisting in their position. They cannot escape the consequences of their action by now claiming that their demand was a "nullity."

There is no dispute that a substantial number of violations of Housing Code regulations were duly noted against the premises and were in existence at the time the contract of sale was executed. Nor is there any dispute that Mrs. Caspar, as record owner of the property, was officially notified of the violations.[13] Prior to the time for settlement, none of these violations had been corrected. Under these circumstances, the purchasers could have refused to consummate settlement and then have brought an action at law against the seller for such damages as they may have sustained. Alternatively, the purchasers could have elected to complete the settlement, and under the survival provisions of the contract, could have sued to recover from the seller such damages as they may have sustained by reason of her failure to correct the outstanding violations.[14] The appellants here made no effort to rescind the contract but instead gave every indication of their intention to go forward with the transaction. Thus, despite the breach of the contract by the seller, the purchasers elected to proceed with the contract and obligated themselves to continue their performance of its terms.[15]

12. *See* note 10, *supra.*

13. Since the violations were both officially noted and notice thereof furnished to the owner, the notices of violations fell within the ambit of the contract. *Cf. Dodek v. Hunter,* D.C.Mun.App., 178 A.2d 915 (1962); *Kraft v. Lowe,* D.C.Mun.App., 77 A.2d 554 (1950); *see also Horby v. Yarmouth,* 67 N.Y.S.2d 525 (Sup.Ct.1945), and *Kaloumenos v. Bottaccio,* 67 N.Y.S.2d 527 (Sup.Ct.1946).

14. *See Mehlman v. Chadwick,* 234 F.Supp. 1014 (D.D.C.1964).

15. *Sitlington v. Fulton,* 281 F.2d 552 (10th Cir. 1960); *Peterson Steels, Inc. v. Seidmon,* 188 F.2d 193 (7th Cir. 1951); *Newark Slip Contracting Co. v. New York Credit Men's Adjustment Bureau, Inc.,* 186 F.2d 152, 154 (2d Cir. 1951); *Ferguson Contracting Co. v. State,* 202 App.Div. 27, 195 N.Y.S. 901 (1922), *aff'd* 237 N.Y. 186, 142 N.E.

To sustain the right to specific performance of their contract, the purchasers must show that they have performed or have offered to perform all of the obligations required of them by the contract.

It is the fundamental doctrine upon which the specific enforcement of contracts in equity depends, that either of the parties seeking to obtain the equitable remedy against the other must, as a condition precedent to the existence of his remedial right, show that he has done or offered to do, or is then ready and willing to do, all the essential and material acts required of him by the agreement at the time of commencing the suit, and also that he is ready and willing to do all such acts as shall be required of him in the specific execution of the contract according to its terms. [J. N. Pomeroy, Specific Performance of Contracts § 322 (3d ed. 1926)].[16]

Thus, where the purchaser under a contract for the sale of property instructed the escrow agent to hold the purchase money deposited with it until further notice and not to pay out any money to the seller, it was held that the purchaser had failed to perform his obligation under the contract to pay the purchase price to the seller and hence was not entitled to specific performance.[17] And where an escrow contract required the purchaser to deposit a specific sum for the account of the vendor, a deposit of such sum with conditions that it could not and would not be paid to the seller did not constitute compliance with

stance or a subsequently-formed decision the contract.[18] Similarly, where the purchase money was paid into escrow by the purchaser with instructions not agreed to by the seller, and which instructions went beyond reasonable requirements for securing the concurrent exchange of the deed for the purchase price, it was held that there was not a sufficient tender of performance on the part of the purchaser.[19] A tender of performance by the purchaser which contains conditions other than those specified in the contract between the parties is ineffectual,[20] and a tender of payment by the purchaser is ineffective where the purchaser has made arbitrary deductions therefrom for unliquidated claims against the seller.[21]

In the case at bar, the trial court concluded that the appellants ". . . were not ready or willing to perform in accordance with the terms of the agreement . . . " and that their " . . . effort to impose conditions other than those specified in the contract resulted in a breach of their contractual duty, and a forfeiture of their right to specific performance of the contract." Appellants dispute this conclusion, pointing to the delivery of their personal check in the amount found to be due in accordance with the settlement sheet signed by them as proof that they were in fact ready and willing to perform their obligations under the contract. However, the evidence of record belies their contention. Appellants appeared at the settlement meeting armed with the letter demanding that a substantial portion of the purchase money be withheld

580 (1923); 17 Am.Jur.2d *Contracts* § 447 (1964).

16. *See also Telfener v. Russ,* 162 U.S. 170, 16 S.Ct. 695, 40 L.Ed. 930 (1896); *Boone v. Missouri Iron Co.,* 58 U.S. (17 How.) 340, 15 L.Ed. 171 (1855); *Bank of Columbia v. Hagner,* 26 U.S. (1 Pet.) 455, 7 L.Ed. 219 (1828); *Mehlman v. Chadwick, supra* n. 14; 71 Am.Jur.2d *Specific Performance* §§ 60, 65 (1973); 81 C.J.S. *Specific Performance* §§ 91a, 95, 101 (1953); Restatement, *Contracts* §§ 374(1), 375(1).

17. *Davy v. Ogier,* 87 Cal.App.2d 835, 198 P.2d 92 (1948).

18. *Hart v. Barron,* 122 Mont. 350, 204 P.2d 797 (1949).

19. *Wuchner v. Goggin,* 175 F.2d 261 (9th Cir. 1949).

20. *Ortman v. Kane,* 389 Ill. 613, 60 N.E.2d 93 (1945); *see also* 74 Am.Jur.2d *Tender* § 24 (1974).

21. *Foxley v. Rich,* 35 Utah 162, 99 P. 666 (1909).

from the seller. This was not a happen- but a preconceived plan by them to compel the seller to accept a lesser sum in pay- ment for the property. The delivery of their check in ostensible payment of the amount due was a mere pretense since ap- pellants never intended to have the seller receive the full amount due her upon settle- ment. The conclusion that appellants were not ready or willing to perform their obliga- tion under the contract to pay the purchase price in cash is adequately supported by the record. By their own conduct, the appel- lants precluded their right to obtain specific performance of the contract.

*Affirmed.*