COLLINS et al. v. ALEXANDER.—260 S. W. (2d) 414.

Western Section. July 16, 1952.

Petition for Certiorari denied by Supreme Court, January 15, 1953.

130

Holmes & Holmes, of Trenton, for complainants.

Clarke, Norris & Matherne, of Brownsville, Currie Drake, of Milan, and Hugh McLean, of Paris, for defendant.

ANDERSON, P. J. This case is improperly styled. It should be: Mrs. Carmen Walker Alexander, executrix of the estate of F. E. Walker, deceased, v. Doris Collins et al.

So far as necessary to be noticed, the bill seeks a declaratory judgment with respect to the title of certain shares of corporate stock. The question is, whether said stock belongs to the estate of F. E. Walker, deceased, or to the defendant, Doris Collins, who claims by virtue of a gift from the deceased.

From an adverse decree, Doris Collins appealed. There seems to be no controversy about the material facts. They were found by Chancellor Gray in an able and well-reasoned opinion, pertinent parts of which are as follows:

"F. E. Walker was the uncle-in-law of Miss Doris Collins and she had lived in his home since she was three years of age, occupying the place of a daughter in his affections. Mr. Walker had been very inactive physically for the last three or four years of his life. His business affairs had been attended to by Miss Doris Collins. He had a lock box in the Milan Banking Company in his name and on which he paid the rent, which lock box had two keys—one kept by Miss Collins since 1946 and one kept for a while by Mr. Walker but during the last few years of his life his key was kept behind a box on a dresser in Miss Collins' room. Mr. Walker's wife, aunt of Miss Collins, died in 1946. On January 29, 1947, Mr. Walker made his will. Miss Collins was special legatee and, likewise, one of the four residuary legatees. His estate consisted alone of personal property. He died May 22, 1950.

"On August 12, 1948, F. E. Walker was the owner of the following stocks:

"Certificate No. To253170 for 13 shares in The Texas Company;

"Certificate No. To3572 for 67 shares in The Texas Company;

"Certificate No. 54 for 5 shares in Model Milling Company of Jackson, Tennessee; and

"Certificate No. 10177 for 20 shares in International Shoe Company.

"These certificates were endorsed with the signature of F. E. Walker dated August 12, 1948, with Miss Doris Collins named in the face of the endorsement as transferee, her name being written in pencil and in the handwriting of Moore Blankenship, and signatures appeared at the bottom of the transfer in the following order: W. R. Walker—Carmen Walker Alexander—F. E. Walker. These stocks were placed in an envelope by F. E. Walker on August 12, 1948, and sealed up by him and the following endorsement thereon: 'To be given to Miss Doris Collins at my death. August 12, 1948. F. E. Walker'.

"The proof shows that all of the above endorsement, with the exception of 'F. E. Walker', was written by Moore Blankenship. The envelope was on August 12, 1948, placed in the lock box in the Milan Banking Company.

"Mr. Walker had other stocks and other property in the lock box. Miss Collins had free access to this lock box and kept some of her personal belongings therein, consisting of stock and jewelry. This envelope remained in the lock box without any change whatever from August 12, 1948, until after the death of F. E. Walker, he having died as aforesaid on May 22, 1950. Miss Collins saw the lock box frequently and the envelope contained therein and never made any effort in any way to ascertain the contents of the envelope or in any manner to take any

manual possession of the envelope. She testified she thought it was to take effect when F. E. Walker died. She was never told the contents of the envelope by Mr. Walker, nor was the incident discussed between them, although the envelope was in the lock box for over a year where she saw it on numerous occasions.

"The proof shows that after these stocks were placed in the envelope and sealed and placed in the lock box, that dividends were paid thereon, some in cash and some in stock, the stock dividends being in the name of F. E. Walker, and that both stock and cash dividends were treated by all parties as the property of F. E. Walker. No effort was ever made to transfer the stocks on the books of the corporation issuing them. F. E. Walker never visited the lock box after the envelope was placed therein and Miss Collins seemed to have transacted practically all of his business, but he did issue checks after the placing of the stock in the lock box and seemed to have directed and decided upon the sale of certain other stocks. The question for determination by the Court is whether or not the stocks were given by F. E. Walker to Miss Coris (sic) Collins, she insisting that the stock was a gift intervivos."

After amplification of authorities and sound reasoning, the Chancellor concluded as follows:

"* * * there was not such a delivery of the stocks as would constitute a gift to Miss Collins and that F. E. Walker had never relinquished right and control of the stocks and could at any time, if he had so desired, disposed of or changed the endorsement on the envelope and that his actions fail to constitute such conduct as would make the transaction a gift intervivos. His endorsement on the envolope, placing the stock in his own

lock box, collecting the dividends and using the proceeds thereof, all show the disposition on his part to retain control of the stocks."

The deceased and his wife never had any children. As said by the Chancellor, they had taken Doris Collins into their home when she was about three years of age and there she had remained. At the time the bill was filed she was fifty years of age. She had never been married and had no source of income other than that derived from a few shares of corporate stock which she inherited from her deceased father. In his will, after making certain special bequests, consisting of family jewelry and cash, the testator provided that the residue of his estate should go to Mrs. Carmen C. Walker, one-fourth; Doris Collins, one-fourth; Mary Dell Collins, one-fourth; and to the heirs of the testator's deceased brother, Charles Walker, one-twelfth; and to the heirs of the deceased's brother, Mack Walker, one-twelfth; and to the heirs of the deceased's brother, W. T. Walker, one-twelfth.

Complainant, Carmen Walker Alexander, who is the same person named in the will as Carmen C. Walker, is a sister of Doris Collins. She is also the executrix of the deceased's will and in that capacity filed the bill in this case. She averred among other things that the stock certificates in question were found by her in a strong box in a bank at Milan, Tennessee, the domicile of the testator; that said strong box was used as a joint depository by the testator and the defendant, Doris Collins. These averments are supported by the undisputed evidence. After averring other facts substantially as found by the Chancellor, the bill alleged that the complainant did not know whether the stock in question belonged to the estate or to Doris Collins. The latter filed a separate answer, in which she claimed the stock by virtue of a gift inter

vivos. The defendant, Mary Dell Collins, a sister-in-law of Doris Collins, filed a separate answer, admitting that the stock belonged to Doris Collins. The other named defendants, referred to for convenience as "The Walkers", filed a joint answer in which they denied the said stocks belonged to Doris Collins and averred they are a part of the residue of the estate and should pass under the will.

The real contest is between Doris Collins and the several Walker defendants, namely, Roy Walker, Verne Walker and Mrs. Mildred Walker Childress. Ray Walker is the same person as W. R. Walker, who signed as one of the witnesses to the endorsement appearing on the stock certificates. None of the Walkers testified. Indeed, the complainant, Mrs. Alexander, and Doris Collins were the only witnesses in the case, and their testimony leaves a few bare spots as to the circumstances immediately surrounding the particular transaction. Miss Collins knew nothing about it, but Mrs. Alexander did, as did Roy Walker and Moore Blankenship. Mrs. Alexander testified that she "took the stock certificates up to Mr. F. E. Walker (the deceased), at Mr. W. R. Walker's suggestion"; that this "had been discussed and it had been decided that Mr. F. E. Walker would set apart some special certificates for Miss Doris Collins". (It does not appear just who participated in the discussions referred to, but it is a fair inference that the discussion was between the deceased and Mrs. Alexander and W. R. Walker.)

In the same connection, Mrs. Alexander further testified: "Mr. W. R. Walker told me to take the certificates up to Mr. F. E. Walker and let him make the things like he wanted them, let him say how much, and he chose the certificates that he thought were very desirable and set that apart for Miss Doris Collins"; that "Mr. F. E. Walker signed his name to the certificates to be given to

Miss Doris Collins; and I witnessed his signature right there and Roy (W. R. Walker) had cooperated with Mr. F. E. Walker and me in this and told me to get his signature and bring the stock certificates to him and he would acknowledge Mr. F. E. Walker's signature. He knew his signature as good as I did. That was about his own words: 'I know his signature'. And Moore Blankenship, Moore's handwriting is on them just because Moore had the little technical knowledge that Roy and I both thought was necessary in handling it. We both had discussed it with Mr. Moore Blankenship and Moore wrote across the front in his own handwriting, and I remember his very words, 'Well, they were just what we supposed Walker would want to say', and as Roy's name was signed in acknowledgment of Walker's signature, I took the envelope and stock certificates back. Walker (the deceased) and I looked them over and talked about them and he felt satisfied and felt easy in his mind."

Mrs. Alexander further testified that after the stock had been put in the envelope and the envelope had been sealed, that the deceased "gave them to me and told me to put them in the box"; that she accordingly took them to the bank and put them "in the lock box that he and sister shared". All the transactions so far as the deceased participated therein took place at his home. He and Mrs. Alexander were the only ones present. Doris Collins was never told of the particular transaction and knew nothing about it except that in going into the lock box from time to time she saw the envelope and the inscription on the back of it. She testified that she was familiar with the stocks owned by the deceased and after seeing the envelope, observed that some were missing. From these facts she deduced that the missing stocks had been enclosed in the envelope. As she expressed it, "I had a

hunch because they were missing from the other stocks and my name was on them, by a process of elimination I had a hunch something had been done.'' This was all that she knew about it. After the death of the deceased, the complainant, Mrs. Alexander, opened the box, found the other stocks belonging to deceased together with his will, and also the envelope containing the stocks in question. As executrix, she opened the envelope and took charge of the certificates and had possession of them at the time the bill was filed.

Miss Collins had used the lock box as a receptacle for her own personal property since 1919. As said, there were two keys to the box. Originally, one was kept by Miss Collins and one by the deceased on a key ring with some other keys. After the deceased became unable to transact business for himself, he turned all of his keys, including the one to the lock box, over to Miss Collins. These were thereafter kept behind a box in Miss Collins' room. The deceased had not gone into the lock box for about four years prior to his death. During that period it became necessary to sell some stock from time to time to obtain cash for living expenses. Upon such occasions Miss Collins went to the box, got the certificates and brought them to the deceased, who selected the ones to be sold.

It does not directly appear how Mrs. Alexander got the key to the lock box when she went to get the stock to carry them to the deceased for the purpose of consummating the transaction under review. Nor does it appear what she did with the key after she was through with it. Since Miss Collins knew nothing about what was going on, the only reasonable inference in that she got it from behind the box in Miss Collins' room and returned it to that place.

It does not affirmatively appear to whom the stock dividends and cash dividends were sent, but since the stock in question stood on the books of the issuing corporations in the name of the deceased, they presumably were sent to him and turned over to Miss Collins for deposit to his account; and it is a fair inference that the certificate representing the stock dividend was placed in the lock box by her. It was found among other certificates belonging to the deceased. It bore no endorsement of any kind. Miss Collins was authorized to check on deceased's bank account for the payment of the joint living expenses of the two, and did so. However, she had a personal bank account of her own. No dividends were deposited in that account.

We have had the benefit of an exceptionally able and well-constructed brief furnished by counsel for the appellant, Doris Collins. He makes a strong argument for a reversal of the decree.

Under the Uniform Stock Transfer Act, Code Section 4094 et seq., certificates of stock are practically negotiable in this state. Figuers v. Sherrell, 181 Tenn. 87, 99, 178 S. W. (2d) 629, 152 A. L. R. 420; see also American National Bank v. Robinson, 27 Tenn. App. 644, 652, 184 S. W. (2d) 393. With this in mind, the principal contention is, that "the Chancellor was in error in applying the laws concerning gifts to the case; * * * the matter is controlled by the Negotiable Instrument Law, * * * and the gift is only incidentally involved". It is argued, therefore, that the Chancellor held that "the burden was upon the donee, Doris Collins, to establish the gift by proving beyond a reasonable doubt not only that the donor intended to make the gift but that there was a delivery sufficient to consummate the gift", and having found that the facts and circumstances were susceptible of dif-

ferent inferences, he accordingly resolved the doubt with respect to the delivery against the donee, whereas he should have applied the rule applicable to negotiable instruments, to-wit, that the legal holder of a negotiable instrument is the prima facie owner thereof and the burden of proof is upon anyone asserting the contrary to prove it. It is insisted that under this rule the doubt with respect to the delivery should have been resolved in favor of the donee instead of against her.

The Uniform Stock Transfer Act prescribes certain formalities, a compliance with which is essential to the transfer of the legal title to shares of corporate stock. But the act does not forbid gifts of such shares under the general rules applicable to that subject, even though such formalities are not complied with. See, Reinhard v. Sidney B. Roby Co., 110 Misc. 152, 179 N. Y. S. 781; Hausfelder v. Security-First National Bank etc., 77 Cal. App. (2d) 478, 176 P. (2d) 84; In re Maijgren's Estate, 193 Misc. 814, 84 N. Y. S. (2d) 664; and Cf. Figuers v. Sherrell, supra.

██ ██ Under the general rule applicable to negotiable instruments, two facts must be made to appear before a presumption of ownership arises: (1) an endorsement by the payee, and (2) delivery. If either is lacking, there is no such presumption. In short, if the instrument is payable to order, it is negotiated not merely by endorsement of the holder but by that plus delivery. See Nevil v. Bank, 158 Tenn. 251, 12 S. W. (2d) 709; and Cf. Allen v. Hays, 139 Tenn. 56, 291 S. W. 135.

It would seem, therefore, that the defendant's contention that under the facts she must be regarded as the prima facie owner of the stock, and that the burden is on her opponents to show the contrary, presupposes that an affirmative answer should be given to the determinative

issue of whether there was in fact a sufficient delivery. However, as we understand the contention, it is that the strict rule requiring doubts to be resolved against a gift, does not apply in a case of a gift or a gratuitous assignment of a negotiable instrument or one which has all the characteristics of such an instrument.

Assignments such as that here attempted are called by the text-writers "gift assignments", and the general rules applicable to gifts inter vivos and gifts causa mortis are applicable. Corbin on Contracts, Vol. 4, page 643 et seq.; Williston on Contracts, Vol. 2, page 1277 et seq.

In Figuers v. Sherrell, supra [181 Tenn. 87, 178 S. W. (2d) 631], involving an alleged gift of corporate stock, the Court stated the issue before it as follows:

"The question presented for decision is whether there is a completed gift to another when a stockholder turns in his certificate of stock and has the corporation issue and record a new certificate in the name of another, but the holder of the old certificate has the new certificate delivered into his own hands and retains possession thereof until his death, nothing else being said or done by him tending to show a gift. Is there here such intention and delivery as is necessary to perfect a gift inter vivos?"

After some discussion of the authorities, the Court said:

"The Court of Appeals has very well stated the substance of the decisions in this state with reference to gifts as follows:

" 'Intention to give and delivery of the subject of the gift must clearly appear. Doubts must be resolved against the gift. There is no delivery unless the complete dominion and control of the gift is surrendered by the donor and acquired by the donee. The burden of proving that a gift was made is upon the donee.'

"See Chandler v. Roddy, 163 Tenn. 338, 43 S. W. (2d) 397, collecting and reviewing the decisions of this Court."

██ This case seems to leave no doubt that the general rule applicable to gifts applies no less to gratuitious assignments of corporate stock than to gifts of any other kind of personal property or interest therein. However, where the intent to make a gift of a present interest is unmistakable, and it appears equally without doubt that the donor intended to make a delivery and thought he had done so, or failed to do so by mere inadvertence, any doubt arising from the fact that the circumstances bearing on the delivery were susceptible to diverse inferences, ought to be resolved, we think, in favor of the gift. Cf. Stephenson's Administrator v. King, 5 Ky. Law Rep. 374, 81 Ky. 425, 50 Am. Rep. 173. Without being so expressly stated, this seems to be the view in which the gifts were upheld in Royston v. McCulley, Tenn. Ch. A., 59 S. W. 725, 52 L. R.A. 899; Wilson v.Wilson, 151 Tenn. 486, 267 S. W. 364; and Chandler v. Roddy, 163 Tenn. 338, 352, 43 S. W. (2d) 397. But we are reluctantly forced to conclude that the circumstances of this case leave no room for a doubt that there was no effectual delivery of the stock in the lifetime of the deceased, and none was intended.

██ It is certainly true as has been said more than once, that no stronger evidence of intention to give a negotiable instrument could be offered than proof of a bona fide endorsement of such an instrument by the donor to the donee. Wilson v. Wilson, 151 Tenn. 486, 267 S. W. 364; Chandler v. Roddy, 163 Tenn. 338, 351, 43 S. W. (2d) 397. And this we think is no less true of a written assignment of a certificate of stock such as we have in this case. But such an intention, however certain, is ineffectual unless carried out by delivery in the lifetime of the alleged donor, and this means a delivery with an intention to pass

a present interest in the stock. Figuers v. Sherrell, supra.

■ It is doubtless true, as the defendant contends, that delivery may be actual or constructive. There was certainly no actual delivery of the certificate and hence the question resolves itself into whether it can be said that there was a constructive delivery.

We feel bound to conclude that there is no view of the facts and the inferences to be drawn therefrom that would justify an affirmative answer without violating established rules.

There is a line of cases in which gifts inter vivos or causa mortis were upheld, in which the donor continued some physical possession of a chose in action after making a gift evidenced by an endorsement to the donee. Royston v. McCulley, supra; Wilson v. Wilson, supra. Those cases are distinguished in Figuers v. Sherrell in the following language:

"In these cases there were distinct and repeated statements and acts of the donor confirming the gift and it was held that his subsequent possession was as agent or trustee for the donee. Here, as we stated in the beginning, apart from having the new certificate issued in the name of his nephew Sherrell never said or did anything with the slightest tendency to show a present gift to his nephew. On the contrary he collected and used the dividends on the stock and finally pledged the certificate for 25 shares and the certificate for the stock dividend to secure his own business obligations."

With the exception that in the present case the deceased did not undertake to pledge the stock after executing the assignment, we have practically the same situation.

He not only never did or said anything with the slightest tendency to show a present gift to his niece after he

executed the assignment, but by signing the endorsement on the envelope he unmistakably manifested an intention not to consummate a present gift by delivery in his lifetime; and that is the principal thing which distinguishes this case from all others of a similar nature in this state or elsewhere, so far as a diligent search has disclosed.

Moreover, the significance of the fact that the certificates were not delivered to the intended donee at the time and the entire transaction kept secret from her, with no explanation whatever, cannot be escaped. She occupied the place of a daughter in his affections and was also his confidential business agent, apparently familar with all of his affairs. Hence if the deceased fully and finally intended a gift of the stocks in praesenti, there is no way to account for the fact that he did not deliver the certificates to her at the time, but instead said they were to be ''given'' to her at his death. The only possible explanation is that he did not want the ownership to pass until his death, and for that reason withdrew delivery during his lifetime.

The defendant attaches particular significance to the fact that in the inscription on the envelope the word ''given'', rather than ''delivered'', is used. From this she argues that it is far more logical, in view of the other facts and circumstances, that the inscription was ''intended as an instruction to whomever might open the box after his death, whether Doris Collins or his personal representative, to give the envelope to Doris Collins because it contained her property, and was not to be considered a part of the estate''.

We are unable to follow this line of reasoning. It postulates of course that the stock had become the property of Miss Collins prior to the death of the deceased, and this in turn presupposes that the gift had been consummated. This is not true because there had been no

delivery with intent to pass a present interest. Upon the other hand, the inscription on the envelope necessarily implied that the contents were not to be delivered to Miss Collins until after the death of the deceased. This seems as clear as if it had been expressly stated. A very simple test, it seems to us, is: Could Miss Collins have maintained an action against the deceased to obtain possession of the contents of the envelope? Clearly not; because by the inscription he had retained physical control of the envelope during his lifetime. A similar test with the same answer was applied in an analogous state of facts by the New York Court of Appeals in Matter of Crawford, 113 N. Y. 560, 21 N. E. 692, 5 L. R. A. 71, a decision quoted with approval in Figuers v. Sherrell, supra.

Another test has been stated thus: "The surrender must be so full and complete that, if the donor should resume control over the property without the consent of the donee, he would be answerable in damages as a trespasser." 38 C. J. S., Gifts, Sec. 20, p. 800. The circumstances, we think, leave no doubt that the deceased rightfully could have retaken possession of the envelope and its contents had he seen fit to do so.

And there does not seem to be any difference of opinion about this phase of the matter.

Professor Corbin deals with it in this language:

" 'Dominion and control' are not lost, and a gift assignment is not effective, as long as the act and expressions of the donor indicate an intention to retain control. He writes an assignment, and even seals it, but retains it in his own possession; there has been no effective assignment. Even if he had received a consideration, the writing and sealing of the undelivered document would not in themselves

be operative acts. So, also, where the alleged donor encloses his written assignment or his testimonial documents of title within a sealed envelope, to be opened only by the donor or .after his death, his intention not to cross the Rubicon is apparent; for that reason he has not lost 'dominion and control' of his right and he has as yet made no effective and irrevocable assignment''. Corbin on Contracts, Vol. 4, page 653, Section 911.

The defendant cities the case of Grymes v. Hone, 49 N. Y. 17, 10 Am. Rep. 313, cited with approval in Scott v. Union & Planters' Bank & Trust Co., 123 Tenn. 258, 130 S. W. 757, as being the one most nearly analogous on the facts. That case involved a gift causa mortis, but delivery is no less necessary in such a case than it is in the case of a gift inter vivos, and the rules governing delivery are about the same. Wilson v. Wilson, 151 Tenn. 486, 267 S. W. 364; Chandler v. Roddy, 163 Tenn. 338, 351, 43 S. W. (2d) 397.

There, the donor, then about 80 years of age and in failing health, made an assignment of shares of bank stock to his granddaughter. After this had been done he kept possession of the assignment for a while, but afterward handed it to his wife to put with his will and other papers in a tin box, telling her at the time, ''I intend this for Nellie. If I die, don't give this to the executor. Give it to her, herself''. The donor died as a result of the illness with which he was afflicted at the time of the transaction. Upon these facts the Court held there was a valid gift causa mortis.

The distinction between that case and this is obvious. Manifestly, the basis for that decision was the view that the donor directed his wife to hold possession of the assignment for the donee. Corbin on Contracts, Vol. 4,

page 649, Section 910. Here, there was no delivery to a third person. The deceased turned the sealed envelope over to Mrs. Alexander, not to be held for Miss Collins, but with the direction that she place it in his lock box among his other valuable papers.

But it is argued that by the placing of the sealed envelope in the lock box to which the intended donee had both keys, there was a constructive delivery in that the certificates were thereby placed under her dominion and control. We cannot agree. As pointed out above, she originally had one key and the deceased had one key; but during the last few years of his life the key which deceased theretofore had was kept behind the box in Miss Collins' room. But under the facts of this case it is impossible to conclude that this key was turned over to Miss Collins with a view to effect a delivery of the contents of the envelope. She had already had both keys for some time prior to the inception of the transaction. This possession was for a twofold purpose: (1) to give her access to her own possessions, and (2) to give her, as the deceased's confidential agent, access to his possessions to enable her to transact the business which he entrusted to her. The possession of the keys under these circumstances gave to Miss Collins no more dominion and control over the sealed envelope and its contents than it did over the other stocks in the box belonging to the deceased. The very most that can be said is that the contents of the lock box were in the joint custody of the deceased and Miss Collins, and this refutes rather than supports her claim. In re Bashford's Estate, 178 Misc. 648, 34 N. Y. S. (2d) 678, and cases cited; see also Reiley v. Fulper, 93 N. J Eq. 112, 115 A. 661.

Upon the whole case we see no escape from the conclusion that the Chancellor's decree must be affirmed.

We have reached this result with reluctance because it is clear beyond peradventure of doubt that the deceased wanted Miss Collins to have this stock. But after diligent effort we found no way to avoid the conclusion that the method he employed in an effort to bestow it upon her was ineffective. To hold otherwise would be directly violative of well-established rules, which have their basis in sound policy.

Since the original bill was filed for the benefit of the estate, the costs of the cause, including the cost of the appeal, will be paid by the executrix out of the assets in her hands.

Baptist and Swepston, JJ., concur.