ANNE G. BODINE, Plaintiff and Respondent, v. RICHARD
A. BODINE and HELEN JANE BODINE, Husband and
Wife, Defendants and Appellants.

No. 11096.
Submitted October 5, 1966. Decided January 19, 1967.
422 P.2d 650.

J. H. Morrow, Jr. (argued), Edmund P. Sedivy (argued), Bozeman, for appellants.

Ben E. Berg, Jr. (argued), Bozeman, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from the findings of fact, conclusions of law and judgment of the district court of the Sixth Judicial District of the State of Montana, in and for the County of Park, the Honorable W. W. Lessley having been called in to preside.

The plaintiff-respondent was the mother of the defendant-appellant Richard Bodine, and mother-in-law of defendant Helen Jane Bodine. Plaintiff brought this action against defendant on two counts. The first count prayed that defendants be declared to hold approximately 2,200 acres of land located in Park County in trust for the plaintiff during her lifetime and that the defendants be required to account for and pay over to the plaintiff the rentals and profits received by defendants from said property for the year 1963, and to reconvey said lands to the plaintiff. The second count prayed that defendant Richard Bodine be ordered to deliver to plaintiff, as owner, certificates of stock of the Investors Mutual, Inc., representing some 318 shares. The trial court entered judgment for plaintiff on both counts.

It is important in this decision that we carefully set forth a

rather detailed fact situation. Anne G. Bodine, plaintiff, was over 80 years of age at the time this matter was heard by the district court, and appeared in district court by way of a deposition. At the time of appeal she had died as had Richard A. Bodine.

Anne G. Bodine was the widow of Alban Bodine a prominent and successful businessman of Livingston, Montana, who died July 10, 1951, leaving surviving Anne G. Bodine, his widow, and four children, Howard Bodine, Richard A. Bodine, Marjorie Bodine O'Connor and Dorothy Bodine Janseen. The defendant Richard was seriously crippled by polio at the age of 7, but in spite of severe physical handicap he attended the University of Montana from which he earned an LL.B. In June of 1941 he entered into the practice of law in Livingston, Montana, and continued in the practice of law until his death in March 1966. In addition to providing the defendant with a fine education it should be noted that his brother and two sisters received college educations in the colleges of their choice. The defendant Richard was the only one receiving a legal education.

While not stated in so many words the facts show that the Alban Bodine family, quite naturally, early in the defendant's life made provisions to insure his well being not only in the education given him but in the estate planning as evidenced by the holographic will of Alban Bodine which directed that the Potter Basin property (the lands here at issue) be devised to Anne G. Bodine to use during her lifetime, with the right to dispose of any part thereof during her lifetime, the remainder to go at her death to Richard. In a will made for Anne G. Bodine on October 15, 1952, just a little over a year after her husband's death, along with bequests to her children, she gave, devised and bequeathed unto Richard A. Bodine, all her real property commonly known and called Potter Basin, in Park County, Montana, and further stated that if he died prior to his mother, the lands in question would go to his wife Helen Jane

Bodine (the other appellant in this case) and their children in equal shares. The defendants, Richard and Helen, have two minor sons.

Both the testimony produced at the trial and the exhibits reveal that both Alban and Anne Bodine were generous parents. Not only did they give each child the best education possible but throughout both of their lives they provided for the needs of their children. The uncontradicted testimony of defendant showed that prior to his father's death a sum over $10,000 was given to Marjorie Bodine O'Connor to help her and her husband purchase a Chevrolet Agency in Nebraska. The exhibits show that after Alban's death the plaintiff gave checks to her son-in-law E. D. O'Connor on the following dates and in the following amounts:

| | | |
|---|---|---|
| a. | August 17, 1953 | --$3,000 |
| b. | August 24, 1954 | --$5,000 |
| c. | August 12, 1957 | --$3,500 |
| d. | June 2, 1959 | --$5,000 |
| | | $16,500 |

Concerning gifts by the parents to Howard, who is now substituted as a party plaintiff after his mother's death, the uncontradicted testimony shows that after Howard's graduation from college he went into the cattle business with his father and that the ranch where they raised Hereford cattle was put in Howard's name. This ranch was later sold for some $65,000 and was not a part of Alban's estate due to it being in Howard's name. There was a $25,000 mortgage mentioned in Alban's will which was part of the estate, but due to Howard's desire to borrow money against the ranch the family agreed to release the mortgage with the understanding that Howard would pay his mother the sum of $1,000 per year so long as she lived. This was done either in the year 1955 or 1956, and according to the testimony given by Richard no $1,000 payments were ever made by Howard. In addition, the testimony

and exhibits show that Howard received from his mother the following:

| a. | May 1, 1957 | --$10,000 |
|----|-------------|-----------|
| b. | June 26, 1957 | -- 200 |
| c. | July 2, 1959 | -- 5,000 |
| d. | June 29, 1960 | -- 3,000 |
| | | $18,200 |

These business dealings and gifts within the family must be considered in light of the testimony concerning plaintiff's actions with regard to her children after Alban's death. As heretofore set forth it is obvious that she was a most generous mother, and not only were Howard and Marjorie given help, but the evidence clearly shows that Richard too benefited. The gifts and arrangements made for him are only different because of his legal relationship to his father's estate and as an adviser to his mother. His mother paid $16,000 on a mortgage Richard had on his home at the time she sold her home in Livingston in the Fall of 1961.

The plaintiff, after the death of her husband Alban, continued to live in Livingston for some 10 years during which time she traveled rather extensively and from the testimony lived well. The estate of her husband was valued over $100,000 and though never fully probated it seemed to provide the necessary income for her to live comfortably. Both sons, Richard and Howard, served as executors for their father's estate and helped their mother in business matters.

As previously set forth, plaintiff sold her home in Livingston in 1961 and moved to Bozeman where her son Howard lived. Whether or not there had been family difficulties prior to that time is questionable, but shortly after her move to Bozeman difficulties arose between the plaintiff mother and her son Richard concerning the 2,200 acres of land previously mentioned, and two stock certificates.

On July 13, 1958, plaintiff executed and delivered to her son

Richard and his wife a warranty deed, made out as husband and wife as joint tenants with right of survivorship. In this deed the mother conveyed all of her interest in the 2,200 acres known as the Potter Basin Lands. The deed was prepared by her son Richard at the mother's request though she stated in a deposition she didn't remember signing the deed. The deed was a specially prepared deed, not a form deed, and was acknowledged by a disinterested third party. Defendant testified that the deed was drawn at his mother's request just prior to a trip she was making to Nebraska and that he was hesitant to draw it. He testified "finally several days before she was taking a trip to Nebraska she called me and said now I want that deed prepared and I want you to bring it down so that I can sign it and deliver it to you. We'll have it recorded right away, and I want that done before I go to Nebraska. That was the 31st day of July. And she told me that she wanted me to—she wanted Jane and me to have this property, both of us, not just one of us. She was very specific. I would like to point out that this was not a form deed that she could have signed in blank."

At the time the deed was signed by plaintiff the Potter Basin land was leased to a Robert Shiplet for $1,500 per year, said lease being for a period of five years commencing January 1, 1957. Under the terms of the lease, payments were to be made to plaintiff. These rentals were paid for the five years by Shiplet though there was some question of who received all or part of the 1961 rental.

In the Fall of 1961, just prior to the termination of the five-year lease to Shiplet the defendant entered into a new lease for a period of three years for the Potter Basin land. This lease was in defendant and his wife's name as the lessors, however, Mr. Shiplet, as had been his custom, made payment to Anne G. Bodine and such check was deposited to plaintiff's account by defendant, signed "her attorney in fact." He testified that this was done because of certain bills that were outstanding par-

ticularly brought on by the fact that his mother had entered a Rest Home on Labor Day 1961. Defendant testified that after the transfer of the land to him in 1958, he estimated that he and his wife had paid one-half the taxes and his mother the other half up through the lease ending in December 1961.

In addition to the deed prepared by defendant, he had a general power of attorney in his name to facilitate handling his mother's business. This was made out on November 13, 1961, several months after his mother went to the Rest Home in Bozeman, and it was used by him in handling her affairs until November 25, 1963, when it was revoked by plaintiff. Shortly thereafter, she gave her son Howard the power of attorney.

In the meantime, in December 1962, the defendant Richard Bodine became very ill. On December 31, 1962, he executed a conveyance of all his property "of every kind and nature whatsoever, and wheresoever situated or located" to his wife, Helen Jane Bodine. This was filed for record November 22, 1963. On the previous day November 21, 1963, defendant, Richard Bodine, executed a quitclaim deed to Helen Jane Bodine of certain real property, including the Potter Basin Land, and to Lots 17, 18 and 19, in Block 88 of Park Addition to the City of Livingston, (the home).

The facts concerning count two revolve around two stock certificates of the Mutual Investors Fund. On January 21, 1953, plaintiff purchased certificate No. 297073 for $1,000, and certificate No. 354419 was purchased by her on January 21, 1954 for $4,000. Both certificates read: "Anne G. Bodine as trustee for Richard A. Bodine." The testimony on how defendant came into possession of these two certificates is conflicting, but there is no testimony imputing a fraudulent taking by defendant.

Both sides agree that up until the time when plaintiff sold her house, in the summer of 1961, just before she went to Bozeman to the Rest Home, that the stock certificates were in a strong box containing other family papers. At that time all

four children, at plaintiff's request, closed out the family home and each took personal family things that they wanted. The defendant's account is that the certificates were taken out of the box by plaintiff and given to him and that he had had possession since that date. He testified that the dividend checks on those certificates were issued to plaintiff, that his brother Howard made a demand on him under his power of attorney for delivery of the certificates on January 20, 1964, but that he refused to deliver. His mother, at the time of the taking of the deposition, admitting that she was mentally a bit hazy because of her age, made conflicting statements about how her son came into possession of the certificates. Early in the taking of the deposition and before she became tired and confused she stated on cross-examination:

"Q. Do you remember giving those certificates to your son Richard? A. Yes.

"Q. And when you use the word 'Bud' you mean Richard? A. I mean Richard.

"Q. Do you remember about when you gave those certificates to him? A. Well they were in his father's strong box and he got it, he took the strong box.

"Q. Did you deliver or give them to him? A. I gave them to him. I consented to his taking them."

Several pages later—still under cross-examination:

"Q. Did you tell Bud he could have the certificates, the Investors Certificates? A. No, I did not.

"Q. You did not, you say? A. No, I did not say he could have them."

Much later in the deposition and just after plaintiff indicated a desire to terminate the conversations with both lawyers she was again asked:

"Q. Didn't you tell Bud that those Mutual Fund certificates were to be his property? A. I don't remember that I did.

"Q. You could have said that? A. I could have."

While defendant sets forth numerous specifications of error

to the findings of fact and conclusions of law of the district judge, we feel that they can be combined and considered in two main discussions.

1. Was there an actual transfer by deed of the Potter Basin lands from plaintiff-mother in 1958 to defendant-son Richard effective at the end of the then existing five-year lease, or did defendant Richard hold these lands and all rentals as a trustee?

2. Was there a legal delivery, with the accompanying intent, and acceptance by the donee which would constitute a gift inter vivos under our law?

We cannot agree with the findings of fact and conclusions of law of the presiding judge as to the 2,200 acres of land located in Potter's Basin. Clearly the exhibits and oral testimony produced by both parties can leave but one inference concerning the period during which this deed was made. The plaintiff was in the process of putting her affairs in order. She and her late husband had given rather generously to the four children. She was a widow approaching her 76th or 77th year and was possessed of an estimated estate of at least $100,000. It is reasonable to assume from all the evidence that she had either discussed with advisers or at least considered paring down the estate for within a little over a year after the deeding of the property in question, she had her children close out the family home and take those things they desired. During the same period she either loaned or gave substantial sums to some of the children. From her own testimony, given through her deposition, she never evidenced a great interest in her fiscal affairs other than that there be money available to care for her needs for the remainder of her life. She estimated those needs to be in the neighborhood of $200 per month and at that time had some $50,000 assets to care for same.

While the plaintiff's thrust of argument goes to sustaining the action of the district court on the following points we must for reasons stated disagree.

1. Citing McQuay v. McQuay, 81 Mont. 311, 263 P. 683, counsel contends that if the evidence satisfied the lower court that we must follow the lower court's findings unless there is a decided preponderance of the evidence against them. Viewing the evidence set forth we find that it does preponderate against the court's findings.

2. Counsel next stresses the constructive trust theory based on the confidential relationship between the parties. In weighing this argument three statutes must be considered:

Section 13-307, R.C.M.1947, provides: *"Fraud, actual or constructive. Fraud is either actual or constructive."*

Section 13-309, R.C.M.1947, provides: *"Constructive fraud.* Constructive fraud consists:

"1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or,

"2. In any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud."

Section 86-210, R.C.M.1947, provides: *"Involuntary trust resulting from fraud, etc.* One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

It must be noted that if we are to sustain the district court in imposing a constructive trust on the Potter Basin lands then fraud must be found. This the trial court failed to do and it should be noted that neither the pleadings nor proof showed a finding of "accident," "mistake," "undue influence," violation of a trust, or wrongful act, as to come within the provisions of section 86-210, R.C.M.1947.

This court in a recent decision, McReynolds v. McReynolds, 147 Mont. 476, 482, 414 P.2d 531, in a case involving transfers of property within a family said:

"Just as the written statements of the defendants were not admissible to vary the terms of the deeds, neither are their oral statements. Where there was nothing ambiguous or uncertain in the terms of a deed it speaks for itself, and parol evidence tending to show a prior or contemporaneous oral agreement or tacit understanding with respect to the terms of the conveyance is inadmissible."

The deed here must be construed as it is written. We can neither put words into the deed which are not there, nor can we put a construction on words directly contrary to their obvious meaning. 23 Am.Jur.2d Deeds, § 161, pp. 209-210.

Under the law of this state and the facts presented here, we must hold the district court in its order improperly imposed a constructive trust on the Potter Basin lands, and order the return of this property to defendants.

Nor do we find merit to plaintiff's contention that the trial court could rely on the conclusive presumption established by subdivision (3) of section 93-1301-6, R.C.M.1947, to resolve the conflict in the testimony of the parties. Such section of the Code provides:

"Specification of conclusive presumptions. The following presumptions, and no others, are deemed conclusive. * * *

"3. Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot,. in any litigation arising out of such declaration, act, or omission, be permitted to falsify it."

We find nothing in the court's findings of fact or conclusions of law to warrant such a finding by the district court.

4. Last but not least the plaintiff contends the trial court properly rescinded the sale of the property under its equitable powers approved by this court in the cases of De Atley v. Streit, 81 Mont. 382, 263 P. 967, and Erdmann v. Erdmann, 127 Mont. 252, 261 P.2d 367. In the De Atley case the court held: "Courts of equity have a marked tendency, owing to the usual

hardship of these cases, to afford the grantor relief, particularly where he is of advanced years and without other means * * *."

We do not disagree with the holding in the De Atley case, nor the holding in the later Erdmann case, rather, as previously shown we find factwise that the cases are not similar. Therefore, the equitable holdings are not applicable.

Concerning the stock certificates, whether or not sufficient evidence was presented to find a legal delivery with intent by the donee to constitute a gift inter vivos, we must sustain the rulings of the trial court.

The evidence discloses that from July 1961, when defendant came into possession, until trial, that the certificates were never endorsed nor is there evidence of an assignment over to defendant.

In considering our statutes on "gifts" and the "Uniform Stock Transfer Act," section 67-1706, R.C.M.1947, provides:

"A gift is a transfer of personal property, made voluntarily, and without consideration."

Section 15-628, R.C.M.1947, provides how title to certificates and shares may be transferred in the following manner: "Title to a certificate and to the shares represented thereby can be transferred only,

"(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or

"(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either blank or to a specified person, or

"(c) By delivery of the certificate with an assignment endorsed thereon or in a separate instrument signed by the trus-

tee in bankruptcy, receiver, guardian, executor, administrator or other person duly authorized by law to transfer the certificate on behalf of the person appearing by the certificate to be the owner of the shares represented thereby."

This court under similar fact situations has held that the burden of establishing the gift rested with the donee. Currie v. Langston, 92 Mont. 570, 16 P.2d 708; In re Brown's Estate, 122 Mont. 451, 206 P.2d 816; Lyons v. Freshman, 124 Mont. 485, 226 P.2d 775, 23 A.L.R.2d 1165.

Recently this court in Marans v. Newland, 141 Mont. 32, 374 P.2d 721, carefully considered a fact situation concerning stock gifts, citing the above cases as part of its authority, however the quantum of proof in the Maran's case is lacking here. For here, in addition to the stock certificates in the strong box, were other family business papers that defendant makes no claim to. Here the stock certificates remain in the name of Anne G. Bodine as Trustee for Richard A. Bodine, the certificates allegedly are or were still in the family strong box. There has been no endorsement or assignment nor did the defendant explain why he had made no effort to get same transferred into his name.

The cause is returned to the district court to be modified to comply with this opinion.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR and DOYLE, concur.

MR. JUSTICE CASTLES, specially concurring:

I concur in the majority opinion with respect to the Potter Basin real estate. It is well established that in an equity case this court can review all questions of law and fact. Hart v. Barron, 122 Mont. 350, 204 P.2d 797; Barrett v. Zenisek, 132 Mont. 229, 315 P.2d 1001. We are therefore not absolutely bound to accept the findings of fact of the district court. This is particularly true when the type of evidence in question can be as readily evaluated by this court as it can by the court be-

low. I feel that the deposition of Anne Bodine is of little or no probative value. It reveals a total lack of ability to remember those events which are here in controversy. Through persistent examination, Anne Bodine would admit that almost any state of facts did or could have existed. For this reason I feel that this deposition cannot be relied upon as a source of evidence.

The majority says, "Viewing the evidence set forth we find that it does preponderate against the court's findings." Rather than balance the evidence presented in this fashion, I believe that there is simply a lack of evidence supporting the finding of the district court as to the real property, particularly in view of the rule announced in Barrett v. Zenisek, supra, that proof of a resulting or constructive trust must be clear, satisfactory and practically free from doubt. The fact that Richard Bodine continued to give his mother rental payments after she deeded over the land has little significance of itself. Surely this is no indication that Richard Bodine promised to "support" his mother in consideration of receiving the property.

The conclusion of the majority also appears to rest on the fact that the district court made no formal finding of fraud or violation of a trust, and therefore failed to support a constructive trust under section 86-210, R.C.M.1947. I believe that a finding of fraud or violation of trust is implicit in the ruling below. We have said that where no findings of fact were either made or requested, every finding necessary to support the judgment of the lower court would be implied. Farmers Union Trading Co. of Sheridan v. Wiggins, 127 Mont. 481, 267 P.2d 117. For this reason I think the rationale of the majority is not well-founded.

The clear and uncontradicted intent of Alban and Anne Bodine was to give the Potter Basin property to Richard Bodine. Because there is a complete lack of evidence to the contrary, the ruling of the district court should be reversed, and I concur.

I must also agree, though with some reluctance, that there is insufficient evidence to show a valid gift of the stock certificates. It is the necessary element of delivery which is not clearly established by the record. Both of the certificates were held by Anne Bodine as trustee for Richard Bodine. However, by the terms of the trust instrument, Anne Bodine retained complete control over disposition of the stock. She could sell or otherwise dispose of the shares, whereupon the trust would automatically terminate. She also was entitled to receive dividends on the stock. The trust arrangement was primarily a testamentary device because the beneficiary, Richard Bodine, would receive a real interest in the stock only if he survived Anne Bodine.

The case of Marans v. Newland, 141 Mont. 32, 374 P.2d 721, cited by the majority, is distinguishable from the case at hand. In the Marans case two types of share certificates were involved. One group was issued in the name of Marans and his children as joint tenants, while others were issued in the name of the children only as tenants in common or sole owners. All of these stocks were left in a safe deposit box held in joint tenancy by Marans and the children. When Marans died, the ownership of the shares was placed in issue. We held that Marans estate had no interest in any of the shares. The stock issued to the children as tenants in common and individually constituted a valid gift when they were purchased. Ownership of stock issued in joint tenancy to Marans and his children passed entirely to the surviving joint tenants on the death of Marans. If the share certificates purchased by Anne Bodine were held in joint tenancy by her and Richard, we could easily follow the holding of the Marans case and find a completed gift when the stocks were purchased. However, the fact that Richard was only named as beneficiary of a revocable trust does not permit us to follow the Marans' holding. He had no present interest in the stocks and there was no delivery to him when the stocks were purchased.

The fact that Anne Bodine had not endorsed the certificates as required under section 15-628, R.C.M.1947, is significant because it is further evidence that no delivery occurred. I do not believe that such endorsement is absolutely necessary to a valid gift of stock certificates. There is a great deal of authority holding that the Uniform Stock Transfer Act (embodied by section 15-628) was enacted for the benefit and protection of corporations, and does not affect the right of individuals to make gifts of stock certificates among themselves. Collins v. Alexander, 37 Tenn.App. 129, 260 S.W.2d 414; In re Maijgren's Estate, 193 Misc. 814, 84 N.Y.S.2d 664; In re Estates of Antkowski, 286 Ill.App. 184, 3 N.E.2d 132; Hausfelder v. Security-First National Bank, 77 Cal.App.2d 478, 176 P.2d 84. So while endorsement might not be necessary to a valid gift, the lack of endorsement by Anne Bodine is further indication that there was no delivery.

Although Anne Bodine consented to Richard taking possession of the certificates, along with other documents, I do not think it would be wise to hold that mere possession establishes a valid delivery, or indicates an intent to make a gift. Even though Anne Bodine intended Richard to acquire the stocks upon her death, the evidence is inadequate to show a valid inter vivos gift, and for the reasons set out above I would affirm that part of the judgment of the district court.