No. 12995

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

THELMA MAHAFFEY, as Guardian of the
Estates of VALARIE and VAUGHN DeLEEUW,
MONTE DeLEEAW and BEVERLY DeLEEUW,
individually and as Administratrix of
the Estate of TIEMAN DeLEEUW, Deceased,

                Plaintiffs and Respondents,

  -vs-

ANNIE DeLEEUW,

              Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
        Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Moses, Kampfe, Tolliver and Wright, Billings, Montana
        D. Frank Kampfe argued, Billings, Montana

    For Respondents:

        James J. Palmersheim argued, Billings, Montana

---

                    Submitted: September 29, 1975

                    Decided:

Filed:

_____
                        Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of the district court, Yellowstone County, Hon. Charles Luedke, presiding.

The issue here is whether there was sufficient credible evidence to support the district court's findings of fact, conclusions of law and judgment ordering defendant to reconvey certain real property to her deceased son's estate and heirs at law. She appeals.

Defendant takes issue with the court's finding of fact No. 10 and conclusions of law Nos. 2, 3, and 4, but the principal issue is whether there was sufficient evidence to support the district court's decision.

Defendant Annie DeLeeuw is the mother of Tieman DeLeeuw, deceased. Hereinafter he will be referred to as Tim. Tim married Thelma Jean Mahaffey in 1946, they had three children, Montey, and twins Valarie and Vaughn. The marriage ended in divorce in November 1966. Tim was later married for a short time to a woman named Ginger, which was terminated by an annulment paid for by Annie, his mother. On February 18, 1970 he married Beverly, the administratrix of his estate and one of respondents here. This marriage terminated with Tim's death in June 1971.

During Thelma and Tim's marriage they developed several businesses and acquired both business and residential properties. Tim established and operated a private garbage hauling business for the Billings suburban area not having municipal services. Each year they operated a large Christmas tree business. Much of the financing of these businesses was through Tim's mother, Annie. Thelma worked in Tim's office answering the telephone and handling the books. From the very beginning of their business ventures they employed James Hoffman, a licensed public accountant, for their bookkeeping and accounting records and tax matters.

Sometime in 1965 Tim and Thelma separated and in 1966 she filed for a divorce requesting partition of all real property and an equitable division of all property, both real and personal that the parties had acquired during the marriage. Immediately after the divorce and partition action was filed, Annie filed a debt action against both of them alleging some $50,000 of preexisting indebtedness. Negotiations between the parties resulted in an agreement in November 1966, in which Annie completely released and discharged the obligation of Thelma. She dismissed the debt action with prejudice, being fully settled on the merits.

Thelma and Tim settled their property differences by partitioning one of their properties, a 14 acre tract called the "Rims" property, with Thelma receiving the family home and 8 acres and Tim receiving 6 acres. Thelma alleges that she withdrew her partition action on all the rest of the property and quitclaimed the same to Tim with the understanding that it remain as security for their children. There is nothing in writing to this effect. The divorce followed with Tim making support payments in the amount of $160 per month for the three children.

Plaintiffs' complaint originally requested that five separate parcels of land be reconveyed, but in pretrial discovery it was learned that the "Cabin" property and the "Heights" or "Shop" property had been settled between Tim and Annie and that only three properties were at issue:

| | | | |
|---|---|---|---|
| #1. | Lots 5,6 and 7, Bl. 39, Orig..Town, Billings | "Office Property" | $14,536 |
| #2. | NE 1/4 NE 1/4, Sec. 29 R. 26E | "Blue Creek" | 9,642 |
| #3. | Tract 1,Cert. Survey 1085 | "Rims" | 19,845 |
| | | | $44,023. |

The record clearly indicates that as to all five properties Annie gave either partial or complete financial assistance to Tim's efforts to purchase the property. As to the above three properties,

- 3 -

for the purposes of this opinion we will note here that they were both pre and post 1966, the date of the property settlement heretofore referred to.

The "Blue Creek" property involving 40 acres was purchased by Tim and Thelma in 1960. Although it was in Tim and Thelma's name, the purchase money of $4,000 was advanced by Annie. Tim was unable to pay Annie and on August 9, 1968, by deed, Tim and Thelma transferred the property to Annie. Since that date, she has paid the taxes on that property.

The "Rims" consisting of 14.6 acres, was purchased in 1954. Although Thelma was vague on where the money came from to purchase this property, the record indicates that Annie sold an apartment house to raise the money for Tim to make this purchase. None of this was repaid to Annie, and Tim and Thelma transferred by warranty deed 5.67 acres of this property to Annie on August 9, 1968. The remainder of the 14.6 acres had been conveyed to Thelma by the property settlement of 1966.

The third piece of property is what is referred to as the "Office Property". This property was purchased in 1951 by Tim and the record indicates that over the period of purchasing this property Tim became delinquent in his payments and had to call on his mother to help make these payments. In 1966, Tim borrowed $6,500 from Annie with the "Office Property" as collateral and a mortgage pursuant to this arrangement was filed. Neither the down payment, any interim payments, nor interest had been paid at the time of Tim's death, except the sum of $650. This property was conveyed to Annie by warranty deed on August 9, 1968.

With this background as to the three parcels of property in question, we now return to the November 1, 1966, out-of-court settlement between Annie, Tim and Thelma and how it affected Tim and Annie's fiscal operations after that date. By that agreement Thelma was relieved of any fiscal obligations, but Tim assumed the

obligations to his mother. Tim was required by the agreement to convey the "Shop" property to Annie; to pay all the remaining mortgage obligations; and to pay Annie $100 per month until the mortgage terminated. He failed to pay either the mortgage or the $100 per month, resulting in cash disbursements by Annie of over $10,000. On November 29, 1966, Tim signed a promissory note along with the mortgage, and received $6,500 for the "Office" property. This sum never was repaid.

Shortly thereafter in 1967, Annie paid Tim's second wife, Ginger, the sum of $1,300 for what appears to be a settlement in an annulment of the second marriage. During the two years after the divorce from Thelma through 1968, it appears from checks introduced at the trial and other records introduced that Annie financed Tim in amounts alleged to range from $30,000 to $50,000.

In late 1968, an agreement was made between Tim and Annie, previously noted, where Tim in an effort to settle with his mother, conveyed over to Annie the five parcels of land. This settlement was handled by Attorney Charles F. Moses and his testimony indicated that it was a business transaction, voluntary on the part of both parties, with no undue influence, fraud or deceit involved by either party. Mr. Moses, who drew up the agreement, made no reference to any trust agreement or any possible reconveyance of the property. It was a final agreement to settle a debt situation between the parties and in the record we can find no proof of any force, coercion or undue influence on the part of Annie in this transaction.

From that date on Annie paid all the property taxes, due and past due, and from that date to the time of Tim's death Annie continued to help Tim in his business.

Defendant alleges the district court erred in its conclusions of law. We agree. Conclusion No. 4 found that a "resultant trust" was created by the conveyances with the defendant as a constructive trustee.

- 5 -

Section 86-210, R.C.M. 1947, provides:

"Involuntary trust resulting from fraud, etc. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

From the reading of section 86-210, it is obvious that if we are to sustain the district court by imposing a constructive trust on these properties, then fraud must be found. This the trial court failed to do and we note that neither the pleadings nor proof show a finding of an "accident", "mistake", "undue fluence", "violation of a trust, or other wrongful act" as to come within the provisions of section 86-210.

In McReynolds v. McReynolds, 147 Mont. 476, 482, 414 P.2d 531, a case involving transfers of property within a family, Justice Castles said:

"Just as the written statements of the defendants were not admissible to vary the terms of the deeds, neither are their oral statements. Where there is nothing ambiguous or uncertain in the terms of a deed it speaks for itself, and parol evidence tending to show a prior or contemporaneous oral agreement or tacit understanding with respect to the terms of the conveyance is inadmissible."

In Bodine v. Bodine, 149 Mont. 29, 39, 422 P.2d 650, this Court said:

"The deed here must be construed as it is written. We can neither put words into the deed which are not there, nor can we put a construction on words contrary to their obvious meaning. 23 Am.Jur.2d Deeds, §161, pp. 209-210."

In its findings of fact Nos. 5 and 10 and its conclusion of law No. 3, the court found that there existed between Annie and Tim, "a mutual relationship of confidence, trust and financial transactions unique to close, personal intra-family ties." As a result of this trust relationship, according to the court, Annie induced Tim to transfer certain properties to her. The record does not support either the findings or the conclusion of law. This Court

in McReynolds is in accord with authority that a confidential relationship between grantor and grantee who are relatives is not sufficient enough to find undue influence on the part of the grantee. Mollendorf v. Derry, 95 Idaho 1, 501 P.2d 199; Dickey v. Clarke, 65 Idaho 247, 142 P.2d 597.

Under Montana law and the facts here, we hold the district court erred in its findings of fact and conclusions of law that defendant induced her son to transfer certain properties to her and that a resultant trust was created making her a constructive trustee for said property.

The cause is returned to the district court to comply with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices.

- 7 -

Mr. Justice Frank I. Haswell, dissenting:

I dissent.

In my view there is substantial evidence supporting the district court's findings of fact; its conclusions of law based on such facts are correct; and its resulting judgment should be affirmed.

As I see it, this case turns primarily on the facts. Admittedly the evidence is conflicting. The district judge, as trier of the facts, resolved these conflicts in favor of plaintiffs. The function of the Supreme Court on appeal is to review the record and determine whether there is substantial credible evidence supporting the trial court's findings of fact. Richardson v. Howard Motors, Inc., 163 Mont. 347, 516 P.2d 1153 and cases cited therein. In an equity case this Court must review all questions of fact and law, and must sustain the trial court's findings of fact unless there is a decided preponderance of evidence against them. Barrett v. Zenisek, 132 Mont. 229, 315 P.2d 1001.

A summary of the principal findings of fact by the trial court is: (1) That a mutual relationship of trust and confidence existed between Tim and Annie.

(2) That Tim was a heavy drinker who could not or would not assert his own judgment in the face of Annie's arguments and remonstrances concerning his personal life and business affairs.

(3) That in August 1968, Annie induced Tim to transfer to her all real estate standing in his name by representing that it was for his own protection and led him to believe that she would reconvey it back to him at the proper time.

(4) That conveyance was made without consideration and with the understanding that Annie would reconvey the property back to Tim on request.

(5) That between the date of Tim's third marriage in 1970 and the date of his sudden and unexpected death in 1971, Annie refused Tim's demand for reconveyance of the property.

- 8 -

The evidence supporting these findings is:

(1)  The first finding is undisputed.

(2)  The second finding is supported by the testimony of Thelma Mahaffey, Tim's first wife to whom he was married for 20 years, and from the death certificate listing acute alcoholism as a contributing cause of death.

(3)  The third finding is supported by the testimony of James A. Hoffman, the licensed public accountant who kept the books and records for Tim's businesses, including accounts between Annie and Tim, for about 20 years and who prepared both Tim's and Annie's income tax returns.  Hoffman testified that in 1968 Annie told him that the property transfer "was only temporary, that it was going to be transferred back to [Tim]"; that so far as his books reflected, there was "still a balance due from Annie to Tim of $1,967.69"; and that all preexisting recorded indebtedness of Tim to Annie had been completely paid and discharged.

Beverly DeLeeuw Pulver, Tim's widow, testified she asked Annie why "the property was in her name, Tim's property was in her name, and she said 'For his protection'; and I said 'Why his protection? You know he's a grown man' and she said he owed money and if he had it in his name then he would get a lien against him * * *."

Thelma Mahaffey, Tim's first wife, testified to a conversation she had with Annie during the time of Tim's marriage to his second wife, when Annie said "there would be no one touch his property or ever take anything away from him because she had it all tied up."

(4)  The fourth finding is supported by the foregoing testimony of the accountant, Hoffman; his ledger and accounting sheets; the property valuation testimony of William F. Stevens, the appraiser; the 1966 agreement, release and satisfaction of judgment by Annie in her debt action against both Tim and Thelma; and the corroborating testimony of Thelma Mahaffey.

(5) The fifth finding is supported by the testimony of Thelma Mahaffey to the effect that Tim so advised her shortly before his death.

I would hold that the foregoing constitutes substantial credible evidence supporting the district court's findings of fact.

Given these findings of fact, the district court's conclusions of law follow as night follows day. The pertinent statute provides:

> "86-210. <u>Involuntary trust resulting from fraud, etc.</u>
> One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

Whether the circumstances here are characterized as constructive fraud, undue influence, or violation of a trust is beside the point. Where, as here, a transfer is made between two persons standing in a confidential relationship without valuable consideration and induced by a promise to reconvey, equity imposes a resulting trust on the property, not because the parties agreed that the property would be held in trust, but to prevent unjust enrichment of the malefactor at the expense of the injured party. Robuck v. Dennis, 149 Mont. 247, 425 P.2d 327; Bradbury v. Nagelhus, 132 Mont. 417, 319 P.2d 503. The abuse of the confidential relationship by failure to fulfill the promise to reconvey is the substance of the wrong for which equity will impose a resulting trust. Scott on Trusts, Third Edition, V. 1, §44.2.

In my view, the majority here has cut off the inheritance rights of the widow and children by making a/factual determination contrary to that of the district court. Therefore, I dissent.

_____
Justice.

- 10 -